**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
WESTERN DIVISION**

| | |
|---|---|
| NICOLE DEIDUN, ELLIOT GORLIN, KELLY JEWELL, NANCY MACINTYRE, and MARY PAYNE, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>HUMANA INC.,<br><br>*Defendant*. | Civil Action No. 3:26-cv-00054-GNS |

**FIRST AMENDED CLASS ACTION COMPLAINT**

1. Plaintiffs Nicole Deidun, Elliot Gorlin, Kelly Jewell, Nancy MacIntyre, and Mary Payne ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action lawsuit against defendant Humana Inc. ("Humana" or "Defendant"), a publicly traded health insurance company, for violations of the Federal Wiretap Act, 18 U.S.C. § 2510 et seq. ("FWA"), and breach of fiduciary duty, intrusion upon seclusion, and unjust enrichment under Kentucky common law. Plaintiffs allege the following facts based upon personal knowledge, investigation by counsel, and information and belief.

2. Defendant wiretapped its insureds in an invasive betrayal of trust. Defendant harvested highly sensitive health-related information from its insureds using hidden tracking tools and secretly disseminated this private data to third parties.

3. Plaintiffs were not notified of Defendant's hidden tracking and harvesting of their private information, which began as soon as Plaintiffs loaded Defendant's website. Nor were Plaintiffs provided any opportunity to limit or consent to Defendant's tracking and harvesting of their protected health information ("PHI").

4. Defendant's public-facing representations about its privacy practices were inadequate and affirmatively misleading, including because Defendant stated that no disclosure of Plaintiffs' private health-related information would occur absent Plaintiffs' express written authorization and that "providing personal information is *always* voluntary." Yet even on pages describing Defendant's purported privacy practices, Defendant surreptitiously tracked and disseminated Plaintiffs' private health-related data, including to third parties Coveo Solutions, Inc. ("Coveo"), Tealium Inc. ("Tealium"), Adobe Inc. ("Adobe"), ForeSee (now merged to become Verint Systems Inc.), and Quantum Metric, Inc. ("Quantum Metric").

5. Despite Defendant's representations that insureds could disable tracking and harvesting of their private information by clicking on the privacy "toggle" switch on Defendant's website, multiple third parties continued to receive transmissions of Plaintiffs' sensitive health information *even* after Plaintiffs selected the highest possible privacy settings using Defendant's toggle switch.

6. Indeed, despite affirmatively representing to users that "You are not sharing information with any third-party apps or websites," Defendant *continued* to transmit Plaintiffs' confidential health-related information to third parties,

deceiving Plaintiffs and defeating any claim that they had informed consent to such interceptions.

7. Plaintiffs seek damages and injunctive relief to redress Defendant's unlawful interception and misuse of their private health-related information.

## NATURE OF THE CASE

### A. Defendant's Interception of Website and Portal Communications

8. This action challenges Defendant's practice of surreptitiously intercepting and misusing personal, and highly sensitive, health-related information of Defendant's insureds provided on Defendant's www.humana.com website, including on Defendant's purportedly secure MyHumana portal, on which insureds can log in to review care and claims, manage prescriptions, and even complete mental health assessments (together with subpages, "Defendant's Website" or "Website").

9. Defendant has violated, and continues to violate, the FWA and Kentucky common law by wiretapping the private health-related communications of Plaintiffs and other insured users of Defendant's Website.

10. Defendant's violations occur as follows: Entirely unbeknownst to Defendant's insureds who are using the Website and portals, third-party vendors, including Coveo, Tealium, Adobe, ForeSee, and Quantum Metric (collectively, the "Third-Party Vendors"), have supplied tracking technologies ("Tracking Pixels" and "Session Replay Code," or "Tracking Technologies") to Defendant, which Defendant has embedded on its Website.

11. These Tracking Technologies load immediately on both public-facing pages of Defendant's Website and within purportedly secure portals for the purpose of covertly tracking, intercepting, and recording insureds' communications with Defendant, including but not limited to insureds' keystrokes (text entered into a search box or information box), web addresses (i.e., "URLs") of individual pages visited, mouse movements, clicks, and/or other electronic communications in real time ("Website Communications").

12. After surreptitiously intercepting and capturing the Website Communications of insureds, Defendant and the Third-Party Vendors use these Website Communications for purposes that benefit and enrich themselves.

13. The Third-Party Vendors use the harvested personal health-related information to create and/or bolster advertising profiles of insureds, to target or retarget advertisements to insureds, and/or to sell information about insureds to other entities for commercial gain.

14. Defendant uses the harvested information to track visits to the Website, allowing Defendant to covertly recreate insureds' entire sessions on Defendant's Website. This includes detailed replays of portal sessions, such as when insureds search for providers, review internal assessments, or access benefits or any prescription information.

15. Defendant also uses the embedded code that loads immediately on the Website to create a replay of insureds' behavior on the Website.

16. This collection of insureds' highly sensitive, private data occurs without notice to or consent from insureds.

17. Defendant causes the collection of this highly sensitive, private data by embedding the code of Tracking Technologies, such as Tracking Pixels, in its Website. The embedded code instantly sends private health-related data to the Third-Party Vendors.

18. Defendant thereby permits the Third-Party Vendors to intercept insureds' private health-related information.

19. Defendant benefits financially by obtaining and analyzing data that enables it to add new customers, replacing the need for (and costs associated with) advertising, and surreptitiously finding targets for advertising campaigns.

20. These commercial advantages come at the expense of insureds' privacy and contradict Defendant's online promises to safeguard health-related information and legal duty to do the same.

**B. Defendant's Legal Duties and Resulting Harms**

21. Defendant's violations have broad-ranging deleterious effects, including because Defendant holds highly sensitive personal, health-related data of Defendant's insureds. These data include private medical and health information, as well as related unique personal identifiers, health details, and other data provided by insureds related to or for the purpose of obtaining healthcare.

22. Federal privacy laws require robust privacy protections for these highly-sensitive, personal, health-related data.

23. Humana is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d et seq., because it operates health plans nationwide, and meets the statutory and regulatory requirements of a health plan. *See* 45 C.F.R. § 160.103.

24. A business associate is an entity that performs activities on behalf of, or provides services to, a covered entity involving the use or disclosure of PHI. *See* 45 C.F.R. § 160.103.

25. Defendant is a business associate as defined by HIPAA because it performs services involving PHI on behalf of its health plan subsidiaries. These services include but are not limited to data analysis and reporting, claims administration, member communication or outreach, and other reviews.

26. Under HIPAA, a covered entity or business associate must comply with HIPAA privacy and security rules with respect to individually identifiable health information ("IIHI"). *See* 45 C.F.R. §§ 164.302–316; 164.500–534.

27. Covered entities or business associates are required to implement administrative, technical, and physical safeguards to protect the confidentiality, integrity, and availability of PHI. 45 C.F.R. § 164.306.

28. Covered entities or business associates are prohibited from using or disclosing PHI except as permitted by law. *See* 45 C.F.R. §§ 164.502(a)(3); 164.504(e).

29. Disclosure of PHI for marketing or analytics purposes – such as to data brokers or advertising networks – is expressly prohibited absent valid, written

authorization. *See* 45 C.F.R. § 164.508(a)(3) ("a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing"); *id.* § 164.508(c)(1)(vi).

30. Defendant acts as a fiduciary with respect to the sensitive data that it collects and manages on behalf of Plaintiffs.

31. By designing, operating, and maintaining the Website through which Plaintiffs access password-protected health information, Defendant assumes the responsibility and duty to safeguard these data and use them solely for authorized, health-related purposes.

32. This fiduciary duty includes a duty of loyalty and care, requiring Defendant to avoid exploiting Plaintiffs' data for commercial benefit or disclosing data to third parties like the Third-Party Vendors without clear, informed, and express consent.

33. Defendant also contracts with the Centers for Medicare & Medicaid Services ("CMS") to administer Medicare Advantage and Medicare Part D prescription drug plans.

34. As an administrator of these plans, Defendant receives, stores, and uses Medicare beneficiary data, including diagnoses, claims information, and prescription histories.

35. CMS requires organizations that administer Medicare Advantage, such as Defendant, to safeguard the privacy of enrollee medical, health, and

enrollment information, and to limit use and external disclosure of that information to permitted purposes. *See* 42 C.F.R. § 422.118(a)–(d).

36. CMS imposes similar privacy and confidentiality duties on Part D administrators like Defendant, requiring them to protect the privacy of beneficiary information and to disclose such information only as allowed by federal or state law. *See* 42 C.F.R. § 423.136(a)–(d).

37. Because Defendant administers these federally regulated Medicare plans, it is subject to overlapping privacy obligations under HIPAA and CMS rules, including requirements to limit uses and disclosures of PHI to treatment, payment, or healthcare operations. 42 C.F.R. § 422.118(a)–(d); 423.136(a)–(d).

38. As a result of Defendant's violations and invasions of the privacy rights of its insureds, including Plaintiffs, its insureds have suffered significant harms, including but not limited to a loss of privacy and control over their data, greatly increased vulnerability to identity theft and fraud, and unauthorized use of their confidential information for the benefit of others.

39. Plaintiffs bring this action individually and on behalf of a nationwide class of all insureds of Defendant whose Website Communications were wiretapped and intercepted via the code embedded on Defendant's Website.

40. Plaintiffs seek all civil remedies provided under the alleged causes of action, including but not limited to compensatory, statutory, treble, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

### A. Plaintiffs

41. Plaintiff Nicole Deidun is a resident of Pontiac in Oakland County, Michigan. She has been insured under a health policy of Defendant through Medicare since early 2025. She currently receives disability benefits and therefore requires specific health accommodations. She regularly visits the Website to access the MyHumana portal, where she searches for providers, views claims and explanations of benefits ("EOBs"), and check the balance on her monthly over-the-counter benefit card.

42. Plaintiff Elliot Gorlin is a resident of Las Vegas in Clark County, Nevada. He has been insured under a health policy of Defendant for more than a decade. During the relevant time period, he routinely accessed Defendant's Website and logged into Defendant's patient portal, where he searched for providers, checked the status of claims, and filled and researched prescriptions.

43. Plaintiff Kelly Jewell is a resident of Valdosta in Lowndes County, Georgia. She is currently insured under a health policy of Defendant. During the relevant time period, she routinely accessed the MyHumana portal to search for providers, view claims, copayments, and EOBs, verify billing accuracy, and research prescriptions. Her husband, also an insured of Defendant through Medicare Advantage, suffers from chronic and degenerative health conditions. She regularly visited the Website and portals to manage his care as well.

44. Plaintiff Nancy MacIntyre is a resident of Winter Springs in Seminole County, Florida. She has been insured under the Gold Plus Giveback HMO plan

administered by Defendant since January 2025. During the relevant time period, she accessed Defendant's Website regularly to perform tasks related to managing her health, including accessing the MyHumana portal to search for providers, verify whether dentists and providers were in-network, look up medications, and verify copays.

45. Plaintiff Mary Payne is a resident of Port Gibson in Claiborne County, Mississippi. She has been insured under a health policy of Defendant through Medicare since 2020. During the relevant time period, she used Defendant's Website regularly, including logging into the MyHumana portal to manage her prescriptions, search for providers, obtain prior authorizations, research medications, and view her claims.

**B. Defendant Humana**

1. Defendant's Business

46. Defendant is the fourth largest health insurance provider in the United States, ranked 39th on the Fortune 500 list with over $16.4 billion in total stockholders' equity in 2024.[1]

47. Defendant is a publicly traded corporation incorporated in Delaware and headquartered in Louisville, Kentucky.

---

[1] Press Release, Humana Inc., *2024 Annual Report*, HUMANA INC. (Feb. 20, 2024), https://humana.gcs-web.com/static-files/6184966b-97e1-46c5-b40e-788b5261a44c.

48. Defendant operates over 100 subsidiaries that provide health insurance services to individuals and employers nationwide.[2]

49. Defendant independently operates the digital infrastructure used by insureds, including Plaintiffs, to access their health plan information.[3] This infrastructure includes the Website, which Defendant operates and controls.[4]

50. In 2024, Defendant generated approximately $117.7 billion in operating revenue, an increase of about 10.7% over 2023.

51. Defendant reported over 20,000 members for the year 2024.[5]

52. A substantial portion of Defendant's business (i.e., greater than approximately 80%) consists of administering government-funded health programs.[6] Defendant reports that its Medicare Advantage and Part D operations account for the dominant share of its total premium revenue and enrollment nationwide.[7]

---

[2] *See* Humana Inc., *Exhibit 21 – List of Subsidiaries* (Form 10-K) (filed Feb. 15, 2024) at Ex. 21, available at SEC Edgar, https://www.sec.gov/Archives/edgar/data/49071/000004907123000011/hum-20221231.htm [https://perma.cc/D3Y6-LDZJ].

[3] *See* Humana Inc., *Annual Report* (Form 10-K) (filed Feb. 15, 2024) at 7, available at SEC Edgar, https://www.sec.gov/Archives/edgar/data/49071/000004907123000011/hum-20221231.htm [https://perma.cc/N9CN-MR4R].

[3] *Explore all Humana plan options*, HUMANA INC., https://www.humana.com/ [https://perma.cc/GVY4-HPTY].

[4] *Id.*

[5] *2024 Annual Report*, HUMANA INC. (Feb. 20, 2024), https://humana.gcs-web.com/static-files/6184966b-97e1-46c5-b40e-788b5261a44c.

[6] *Id.*

[7] *Id.*

53. Specifically, Defendant lists in its "Insurance Segment" breakdown that 75.6% of its consolidated premiums and services revenue, or about $88 billion, was from Medicare Advantage operations in 2024.[8] Defendant additionally derived 2.7% of its consolidated premiums and services revenue from its Part D operations.[9]

54. A significant portion of Defendant's remaining consolidated premiums and services revenue (i.e., more than approximately 9.0 %) is derived from "state-based contracts," which, according to Defendant, "serve members enrolled in Medicaid."[10]

55. Defendant is a "person" as defined in the FWA. 18 U.S.C. § 2510(6).

2. Defendant's Provision of Healthcare Services

56. Defendant offers stand-alone healthcare insurance, as well as health insurance plans that supplement federally mandated healthcare programs.

57. Defendant's disclosures[11] with the U.S. Securities and Exchange Commission ("SEC") show that it contracts with CMS, an agency of the United States Department of Health and Human Services that administers the Medicare program.

58. In turn, Defendant provides a comprehensive array of insurance benefits, including wellness programs, chronic care management, and care

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *See* Humana Inc., *Annual Report* (Form 10-K) (filed Feb. 15, 2024) at 7, available at SEC Edgar, https://www.sec.gov/Archives/edgar/data/49071/000004907123000011/hum-20221231.htm [https://perma.cc/N9CN-MR4R].

coordination, to Medicare eligible persons under health maintenance organizations (HMOs), preferred provider Organizations (PPOs), and private fee-for-service (PFFS) plans in exchange for contractual payments received from CMS.

59. For instance, Defendant delivers healthcare through vision and dental insurance plans and through Medicare-related plans. Its Medicare offerings[12] include Medicare Advantage, Medicare Supplement, and Medicare Part D plans, which provide coverage beyond what basic Medicare offers.[13]

60. In addition, Defendant administers Medicaid benefits and add-ons offered via the Humana Healthy Horizons program.[14]

61. In addition to its insurance segment, Defendant offers "payor-agnostic" healthcare services, meaning healthcare offerings that do not depend on a specific insurance plan, network, or reimbursement or payment arrangement.

62. These "payor-agnostic" offerings include pharmacy dispensing services, provider services, and home health services as part of its CenterWell segment.[15]

63. According to Defendant's public disclosures, it provides the "coordination of care for [its] members, product and benefit designs, hospital

---

[12] *Understanding Medicare Add-Ons*, GUARDIAN HEALTH NETWORK, https://guardianhealthnetwork.com/medicare-add-ons/ [https://perma.cc/3G2B-73A7].
[13] *Explore all Humana plan options*, HUMANA INC., https://www.humana.com/ [https://perma.cc/GVY4-HPTY].
[14] *Humana Medicaid*, HUMANA INC., https://www.humana.com/medicaid [https://perma.cc/5RJ2-F3L4].
[15] *See* Humana Inc., *Annual Report* (Form 10-K) (filed Feb. 15, 2024) at 7, available at SEC Edgar, https://www.sec.gov/Archives/edgar/data/49071/ 000004907123000011/hum-20221231.htm [https://perma.cc/N9CN-MR4R].

inpatient management systems, the use of sophisticated analytics, and enrolling members into various care management programs."[16]

64. Defendant further states in its public disclosures that it "bear[s] general business risks associated with operating [its] [c]ompany such as professional and general liability, employee workers' compensation, cybersecurity and officer and director errors and omissions risks."[17]

65. Defendant retains certain of these risks through its wholly-owned, captive insurance subsidiary, but remains liable in the event this subsidiary is unable to pay the subsidiary's portion of any losses.[18]

66. Defendant acts with actual authority to operate the Website, which includes authority over how insureds navigate the Website, what information is made available to insureds, how personal data are collected, and what Third-Party Vendor code is embedded on the Website.

67. Defendant retains the exclusive right to control the Website, including the right to make decisions about what data gets collected, how these data are used, and how Tracking Technologies are implemented.

68. As such, Defendant is legally responsible for its conduct with respect to its Website under federal and Kentucky law.

## JURISDICTION

### A. Subject Matter Jurisdiction

---

[16] *Id.* at 12.
[17] *Id.* at 15.
[18] *Id.*

69. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action in which the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs; there are 100 or more members of the proposed class; and at least one member of the proposed class is a citizen of a state different than Defendant.

70. Jurisdiction is proper in the Western District of Kentucky because Defendant is headquartered in Louisville, Kentucky.

71. Defendant's deployment of Tracking Technologies and its decisions about data collection and disclosure were directed from or occurred in this District.

72. Likewise, venue in this District is neither arbitrary nor inconvenient for Defendant, as it is where it is headquartered and conducts substantial business.

**B. Original Jurisdiction (FWA)**

73. This Court also has original jurisdiction under 28 U.S.C. § 1331 because this action arises under the FWA.

74. Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, known as the FWA, to protect the privacy of wire, oral, and electronic communications from unauthorized interception, disclosure, and use. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. III, 801-804, 82 Stat. 197, 211–25.

75. In 1986, Congress passed the Electronic Communications Privacy Act ("ECPA") to amend the FWA in order to protect the privacy of electronic communications. Pub. L. No. 99-508, 100 Stat. 1848.

76. The ECPA was enacted to "update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. No. 99-541, at 1 (1986), as reprinted in 1986 U.S.C.C.A.N. 3555, 3555.

77. Title I of the ECPA amended the FWA to expand its coverage beyond wire and oral communication and "address[ ] the interception of . . . electronic communications." S. Rep. No. 99-541, at 3 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3557.

78. The "paramount objective of the [ECPA] is to protect effectively the privacy of communications."[19]

79. The FWA defines "person" to include "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

80. The FWA prohibits any "person" from (1) intentionally intercepting, endeavoring to intercept, or procuring another person to intercept or endeavor to intercept any wire, oral, or electronic communication; (2) intentionally disclosing, or endeavoring to disclose, the contents of any such communication knowing or having reason to know it was unlawfully intercepted; or (3) intentionally using, or

[19] *Joffe v. Google*, 746 F.3d 920, 931 (9th Cir. 2013) (quoting *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 18 (1st Cir. 2003)).

endeavoring to use, the contents of any such communication knowing or having reason to know it was unlawfully intercepted. 18 U.S.C. § 2511(1).

81. The FWA, as amended by the ECPA, defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." 18 U.S.C. § 2510(12).

82. The term "contents," with respect to communications, includes "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

83. The FWA provides a civil cause of action to "[a]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter" against the person or entity who engaged in such conduct. 18 U.S.C. § 2520(a).

84. The FWA permits recovery of preliminary and permanent injunctive relief, the greater of actual damages or statutory damages calculated at $100 per day or $10,000 per violation, punitive damages, and attorneys' fees and costs. 18 U.S.C. § 2520(b)–(c).

85. Although the FWA includes an exception permitting interception with the consent of "one of the parties to the communication," this exception does not apply where the interception is done "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State" (also commonly known as the "crime-tort exception"). 18 U.S.C. § 2511(2)(d).

## FACTUAL ALLEGATIONS

### I. How Websites Can Use Code to Harvest Users' Private Information

#### A. Websites Can Be Used to Harvest Personal Data from Users

86. Web browsers are software applications that allow users to navigate the Internet and view and exchange electronic information and communications.

87. Each "device" (such as a computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

88. Websites are hosted on servers, which are computers that store the site's data and facilitate the exchange of information between the website and the users' browsers.

89. An HTTP request is a message sent from a web browser to a website's server to ask for information, such as loading a webpage or submitting a query.

90. An HTTP response is the message that a website's server sends in response to an HTTP request to the browser. It includes the requested information.

91. Web interactions involve HTTP requests and HTTP responses, with each browsing session typically involving thousands of these exchanges.

92. When a user visits a website, the website sends a small amount of data, known as a "cookie," to be stored on the user's browser.

93. Cookies are then stored locally on the user's browser and included with future requests to the same server.

94. Cookies are used to "remember" users between sessions, including how users interact with the website.

95. When users log in to a website and it "remembers" them, it is often because of a cookie.

96. Because of the data and privacy concerns associated with cookies, many legal jurisdictions regulate their use. For example, California's Consumer Privacy Act requires businesses to disclose the use of cookies, and the European Union's General Data Protection Regulation mandates user consent before cookies are placed on devices.

97. When a user visits a website, the browser sends an HTTP request to the server, requesting specific information – for example, the "Find Care" selection on Defendant's Website.

98. The server responds with an HTTP response, which includes the requested data in the form of "markup."

99. This markup is the underlying structure for what the user sees on the webpage, such as text, images, and interactive elements.

100. Websites are built using this markup and "source code," which provides instructions to the browser, dictating how the page behaves when it loads or when a particular action occurs.

101. Source code may be written to include instructions to send data to third parties via background HTTP requests.

102. Users may be unaware that data are being sent to third parties.

103. These background requests can be designed to function like a digital wiretap, capturing and transmitting communications, and facilitating the covert harvesting of consumer data.

104. Source code may also be written to send user data outward.

105. This source code can send information – like searches or messages – from the user's browser to the website's server.

106. The requests contained in source code can secretly send user data to third parties, because the requests send data via the HTTP request and not in a visible place like the browser's address bar, so users are generally unaware that any data transmissions are even occurring.

107. When source code is written to send these data requests to third-party tracking domains and servers, the third parties receive user data that users may not have intended to disclose.

### B. Tracking Pixels and Session Replay Code Can Be Used to Extract Individuals' Private Information

108. Tracking Pixels include a broad range of HTML and JavaScript code embedded in websites and emails.[20]

109. Tracking Pixels are hidden from sight.

110. Tracking Pixels trigger a network traffic request to the tracking entity's remote server.

---

[20] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FTC (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking [https://perma.cc/Y8TJ-53FD].

111. By triggering this network traffic request, Tracking Pixels can track, collect, and send to third parties various private and/or personal data, such as how a user interacts with the website or information typed into text fields.[21]

112. Because Tracking Pixels embedded into websites such as Defendant's Website operate silently in the background, users often do not realize that their private and personal data are being collected as they browse the website.[22]

113. Tracking Pixels may collect various types of information, including sensitive information.

114. Some Tracking Pixels harvest data regarding website users' entertainment or shopping habits and preferences.

115. In this case, the Tracking Pixels embedded on Defendant's Website do not merely collect shopping trends or similar commercial data; instead, Defendant's Tracking Pixels collect highly sensitive, personal health-related information.

116. Traditional methods of preventing web-browsing data from being collected, such as blocking third-party cookies, frequently do not prevent Tracking Pixels from collecting user data. As a result, users may have no effective way to block the collection of their private information by Tracking Pixels.[23]

117. While some Tracking Pixel providers claim that they attempt to remove personal information from the data they collect, these efforts are not always successful.

---

[21] *Id.*
[22] *Id.*
[23] *Id.*

118. For example, the Federal Trade Commission ("FTC") has said that methods such as "hashing" personal information to scramble it may be inadequate.[24]

119. Session Replay Code operates similarly to Tracking Pixels, often relying on network traffic requests to transmit recorded interaction data.

120. However, Session Replay Code extracts even more intrusive details about users' browsing behavior.

121. Specifically, Session Replay Code logs and tracks *everything* a user does on a webpage, including mouse movements, clicks, scrolls, and taps, and can actually track every single key stroke, creating a *complete* reproduction of the user's visit to the website.[25]

122. Network traffic requests are also often used by Tracking Pixels and Session Replay Code to send user data back to third-party servers.

## II. Confidential Personal Heath Data Covertly Obtained from Websites Presents Serious Privacy Risks

123. Data pertaining to individuals are so valuable they have been compared to the "new oil."[26]

---

[24] *Id.*; Ed Felten, *Does Hashing Make Data "Anonymous"?*, FTC (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous [https://perma.cc/5UMN-UZR4].

[25] *The definitive guide to session replay*, FULLSTORY (Oct. 8, 2024), https://www.fullstory.com/blog/session-replay/ [https://perma.cc/56WH-8GQ5].

[26] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data [https://perma.cc/US3V-CPCU].

124. However, the market for such data, and in particular personal health-related data, presents serious privacy risks.

125. For this reason, Time Magazine has pointed out that the health data market, while highly lucrative, poses a significant risk to individuals' privacy.[27]

126. Nevertheless, the enormous value of personal health data incentivizes businesses to use invasive tracking technologies on their websites to collect these data from website users.

127. For example, the data collected by Tracking Pixels are valuable to businesses because they can use them to track Internet users and target ads based on prior browsing behavior.[28] This practice can be highly lucrative.

128. As one report explained, "There's a whole market of brokers who compile the [personal health] data from providers and other health-care organizations and sell it to buyers."[29]

129. According to a report from cybersecurity company Feroot Security, "medical-related websites continue to be mined for data including personal medical information[.]"[30]

---

[27] Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME (Jan. 9, 2017, 9:00 AM), https://time.com/4588104/medical-data-industry/ [https://perma.cc/F3WR-HHVL].
[28] *Id.*
[29] Christina Farr, *Hospital Execs Say They Are Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html [https://perma.cc/D7CL-N3HX].
[30] *Private Health Data Still Being Exposed to Big Tech, Report Says*, INSURANCE JOURNAL (Oct. 17, 2023),

130. As early as 2015, experts were researching how confidential health information is shared with third parties without users' knowledge.[31]

131. In June 2022, an investigation by The Markup[32] revealed that one Tracking Pixel, the Meta Pixel, collected and sent a "data packet" to Facebook whenever a user engaged with some hospital websites, such as clicking to schedule a doctor's appointment.

132. Further research by The Markup revealed that the personal health data transmitted to Facebook by the Meta Pixel from hospital websites included not only sensitive health information, such as details about medications, allergies, and upcoming doctor visits, but also personally identifiable information, including patients' names, addresses, email addresses, and phone numbers.

133. Additionally, The Markup's investigation found that the Meta Pixel was embedded in public-facing hospital websites and within password-protected patient portals at seven health systems, including FastMed and Novant Health.[33]

134. The FTC has taken enforcement action against Internet providers who track sensitive health data.

---

https://www.insurancejournal.com/news/national/2023/10/17/744625.htm [https://perma.cc/M8YP-WDKU].

[31] Timothy Libert, *Privacy Implications of Health Information Seeking on the Web*, COMMUNICATIONS OF THE ACM (March, 2015), https://timlibert.me/pdf/Libert-2015-Health_Privacy_on_Web.pdf [https://perma.cc/NC4F-5GRZ].

[32] *About Us*, THE MARKUP, www.themarkup.org/about [https://perma.cc/RUU9-JUQS].

[33] *Id.*

135. For example, in June 2022, the FTC finalized a settlement with Facebook regarding its covert collection of sensitive medical data when Flo, an ovulation tracking app, shared users' private health information with Facebook[34] and other advertisers.[35]

## III. The Unauthorized Collection of Personal Health Data Contravenes Legal, Ethical, and Social Norms

### A. Website Users Reasonably Expect Personal Health Information to Be Confidential

136. Personal health data collected by Tracking Pixels, Session Replay Code, and other Tracking Technologies may be "highly personal information that people choose not to disclose even to family, friends, or colleagues," which nevertheless "is actually shared with complete strangers."[36]

137. According to the FTC, PHI is "[a]mong the most sensitive categories of data collected by connected devices[.]"[37]

---

[34] *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, FTC (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google [https://perma.cc/V33W-LEEE].

[35] Justin Sherman, *Your Health Data Might Be for Sale*, SLATE (June 22, 2022), https://slate.com/technology/2022/06/health-data-brokers-privacy.html [https://perma.cc/L7U4-4VMW].

[36] Kristin Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*, FTC (July 11, 2022) https://www.presidency.ucsb.edu/documents/white-house-press-release-location-health-and-other-sensitive-information-ftc-committed [https://perma.cc/67CF-PZ3Y].

[37] *Id.*

138. Personal health information collected by websites "may pose an incalculable risk to personal privacy."[38] The practice of allowing third-party vendors to "collect that data, combine it, and sell or monetize it" would be an "unprecedented intrusion."[39] That is exactly what Defendant has done, and is doing.

139. Consumers' confidence that their personal and private health data will be kept secure is a major public health issue.

140. A 2015 review found that "the social stigma associated with some health conditions is among the top reasons consumers delay or avoid getting help for mental health problems."[40]

141. The fear of "disclosure and confidentiality concerns" was a prominent cause of this stigma.[41]

142. Once a person's private and sensitive health information is available, it exposes that individual to significant harm.

143. Personal health data are used by criminals and other malevolent actors to facilitate phishing scams, commit identity theft, and inflict physical or emotional injury.[42]

---

[38] *Id.*
[39] *Id.*
[40] *Report: Companies continue to share health data despite new privacy laws*, CONSUMER REPORTS (Jan. 15, 2024), https://advocacy.consumerreports.org/research/report-companies-to-share-health-data-despite-new-privacy-laws/ [https://perma.cc/2WRY-6QAB].
[41] *Id.*
[42] Kristin Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*, FTC (July 11, 2022) https://www.ftc.gov/business-guidance/blog/2022/07/location-

144. Information about private health and medical matters, especially data related to sexual activity or reproductive health, "may subject people to discrimination, stigma, mental anguish, or other serious harms."[43]

### B. Personal Heath Information Can Be Harvested for Commercial Gain

145. Companies that collect personal information "have a profit motive to share data at an unprecedented scale and granularity."[44]

146. Once an individual's personal and private health data are collected, they "often have no idea who has it or what's being done with it."

147. The data "enters a vast and intricate sales floor frequented by numerous buyers, sellers, and sharers."[45]

148. In a 2014 study, the FTC reported that data brokers use data collected from consumers to create profiles that may contain sensitive inferences, such as categorizing someone as an "expectant parent."[46]

149. Once these invasive and sensitive profiles have been created, the brokers use them to target "personalized" ads at people, tracking them across the Internet.[47]

---

health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal [https://perma.cc/67CF-PZ3Y].

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*; *Data Brokers: A Call For Transparency and Accountability: A Report of the Federal Trade Commission*, FTC (May 2014), https://www.ftc.gov/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014 [https://perma.cc/4LSS-RTV6].

[47] *Id.*

150. The categories that consumers are placed into can be incredibly private or invasive, such as "working-class mom," "frequent alcohol drinker," "financially challenged," or "depression sufferer."[48]

151. In the same 2014 study, one data broker bragged to shareholders that it had 3,000 points of data for nearly every consumer in the United States.[49]

152. Data aggregators and brokers gather this collected personal data and "sell access to it (or analyses derived from it) to marketers, researchers, and even government agencies."[50]

153. The scale of the personal and private data flowing from users to brokers is staggering.

154. The sheer number of ads shown to Internet users is overwhelming, with Americans exposed to an estimated 5,000 ads daily.[51]

155. According to the FTC, "some popular ad exchanges can handle tens of billions of auctions per day. Each auction involves a broadcast of consumer data

---

[48] *Online Advertising & Tracking*, EPIC, https://epic.org/issues/consumer-privacy/online-advertising-and-tracking/.
[49] *Data Brokers: A Call For Transparency and Accountability: A Report of the Federal Trade Commission*, FTC (May 2014), https://www.ftc.gov/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014 [https://perma.cc/4LSS-RTV6]; Kristin Cohen, *Location, Health, and Other Sensitive Information: FTC Committed to Fully Enforcing the Law Against Illegal Use and Sharing of Highly Sensitive Data*, FTC (July 11, 2022) https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal [https://perma.cc/67CF-PZ3Y].
[50] *Id.*
[51] *Online Advertising & Tracking*, EPIC, https://epic.org/issues/consumer-privacy/online-advertising-and-tracking/ (last visited Nov. 4, 2025).

being sent to potentially dozens of bidders simultaneously, despite only one of those parties – the winning bidder – actually using that data to serve a targeted ad."[52]

156. Once private and personal data are in the hands of data brokers, "there are few (if any) technical controls ensuring that [they] do not retain that data for use in unintended ways."[53]

### C. Unauthorized Collection and Tracking of Private Health Information Is Prohibited

157. Humana is a covered entity under HIPAA because it functions as a health insurance issuer and administrator of health benefits.

158. The U.S. Department of Health and Human Services ("HHS") has issued a bulletin covering the use of online Tracking Technologies, such as Tracking Pixels and Session Replay Code, by these HIPAA-covered entities. The bulletin clarifies the privacy and security rules promulgated under HIPAA, 42 U.S.C. §§ 1320d–1320d-9.

159. The HHS bulletin states that "[r]egulated entities are not enabled to use tracking technologies in a manner that would result in impermissible disclosures of [PHI] to tracking technology vendors or any other violations of the HIPAA rules."[54]

---

[52] *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, FTC (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla [https://perma.cc/8WYU-UPGW].
[53] *Id.*
[54] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html [https://perma.cc/LT73-TWQD].

160. The bulletin continues, "[f]or example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[55]

161. The bulletin further explains that PHI collected by Tracking Technologies placed on websites, such as Tracking Pixels and Session Replay Code, can include "an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code."[56]

162. Defendant's use of Tracking Technologies on the Website, such as Tracking Pixels, violates HHS's bulletin, which explicitly states that regulated entities like Defendant are not permitted to use Tracking Technologies in ways that lead to impermissible disclosures of PHI to third parties without obtaining HIPAA-compliant authorizations.

163. The HHS bulletin further clarifies that disclosure of PHI to vendors for marketing purposes (including targeted advertising or analytics used to improve advertising performance) violates HIPAA without HIPAA-compliant authorization from the individual.

164. On December 1, 2022, CMS spotlighted the HHS bulletin on online Tracking Technologies in its weekly CMS "Snapshot" newsletter,[57] signaling to

[55] *Id.*
[56] *Id.*
[57] *Centers for Medicare & Medicaid Services*, CMS Snapshot: November 24 to December 1, 2022 (Dec. 1, 2022), available at

insurers administering Medicare Advantage and Part D plans (like Humana) that they must avoid disclosing PHI through Tracking Technologies.

165. Defendant's conduct, including enabling Third-Party Vendors to track insureds on Defendant's Website for advertising purposes, is exactly the type of unauthorized data sharing of sensitive medical information that the HHS bulletin states is prohibited.

166. On user-authenticated websites, which require a user to log in before gaining access to the site, Tracking Technologies may "have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal."[58]

167. Even on unauthenticated websites, which do not require users to log in before gaining access to the website, Tracking Technologies may obtain access to an individual's PHI.

168. The HHS bulletin gives the following example: "[I]f an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the

---

https://www.cms.gov/files/document/snapshotupdate12012022.pdf [https://perma.cc/7FJR-FTYP].

[58] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html [https://perma.cc/LT73-TWQD].

information is both identifiable and related to the individual's health or future health care."[59]

169. The HHS bulletin outlines the harms that disclosure of PHI may cause, including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI."[60]

170. The disclosure of an individual's PHI "can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment."[61]

171. In a joint letter sent on July 23, 2023, to hospital systems and telehealth providers, the FTC and the HHS Office for Civil Rights also reiterated the risks posed by the disclosure of an individual's PHI to third parties.

172. The joint letter noted that such disclosures could reveal "sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment."[62]

---

[59] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html [https://perma.cc/LT73-TWQD].
[60] *Id.*
[61] *Id.*
[62] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FTC (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-

173. At the state level, Kentucky grants protections for medical records, including in KRS § 210.235 (recognizing the confidential nature of medical records), KRS § 216.515(7) (duties of facilities to maintain record confidentiality), and KRS § 422.315 (patient rights to limit or prohibit use of medical records).

174. Kentucky also protects data possessed by entities that administer plans for CMS or Medicaid as Humana does, including in KRS § 205.623 (Medicaid information shall remain confidential).

175. The American Medical Association's ("AMA") *Code of Medical Ethics* also promulgates rules that protect the privacy of patient data and communications.

176. These AMA rules include, but are not limited to, *AMA Code of Medical Ethics* Opinion 3.1.1 ("[p]atient privacy encompasses a number of aspects, including . . . personal data"); Opinion 3.2.4 ("Information gathered and recorded in association with the care of the patient is confidential."); and Opinion 3.3.2 ("Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored.").

## IV. Confidentiality Expectations in Member Portals

177. Password-protected portals are subpages of a health insurer's website to which users gain access only after registering, verifying identity, and logging in with credentials.

178. These portals typically provide individualized services to users, including the ability to research medical and health issues, view insurance claims,

---

systems-telehealth-providers-about-privacy-security-risks-online-tracking [https://perma.cc/EB3S-UF3V].

obtain explanations of benefits, track insurance deductibles, review prescriptions, and update member profile information.[63]

179. Portals function as live dashboards, providing, among other things, updates on claims, prescriptions, lab results, and secure messaging. Because these updates are continuous, portal activity creates a detailed summary of an individual's health. Studies show that increased portal use is associated with better health outcomes.[64]

180. Portal content is nonpublic and tailored to each insured; it is not accessible to anonymous website visitors.

181. Because portal interactions are tied to a specific user's identity, the data displayed or transmitted often constitutes individually IIHI, a category of PHI under HIPAA. 45 C.F.R. § 160.103.

182. From an insured's perspective, logging into a portal signals entry into a private communication channel with the insurer in which there is an expectation that health information shared in the portal will be kept confidential.[65]

---

[63] Courtney R. Lyles, Janey Hamblin, Victor Y.X. Lin, Dean Schillinger, *Legal, Practical, and Ethical Considerations for Making Online Patient Portals Accessible for All*, 107 Am. J. Pub. Health 1608 (2017), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5607665/pdf/AJPH.2017.303933.pdf [https://perma.cc/U52A-RE2Q].
[64] *Id.*
[65] *K.L. v. Legacy Health*, No. 23-1886, 2024 U.S. Dist. LEXIS 206864, at *9 (D. Or. Nov. 14, 2024).

## V. Defendant Covertly Intercepted Plaintiffs' Sensitive Health Information for Commercial Profit

### A. Defendant Covertly Wiretaps Website Communications Within Public Facing Page and Three Portals

183. Despite deep public concerns about Internet privacy and the sensitivity of personal health-related data, Defendant unlawfully embedded code on the Website that allows Third-Party Vendors to harvest, for financial benefit, the sensitive private health information of the users of Defendant's Website, insureds of Defendant.

184. Further, by embedding this tracking inside portals, Defendants violated HIPAA's privacy rules by improperly disclosing PHI to the Third-Party Vendors. This violation occurred even if Plaintiffs had not done a single search, as patient status itself is PHI under HIPAA, and Plaintiffs' logins confirmed that they are receiving or have received care. *See Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1081–82 (W.D. Wash. 2024) (stating, within a HIPAA framework, "[a]s other Courts within this Circuit have acknowledged, the transmission of information submitted to a *private patient portal*—such as a user clicking on the 'log in' button on that webpage—reveals patient status, which in and of itself is protected health information."); *In re Meta Pixel Healthcare Litig.,* 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) (finding that "patient status is protected health information" under HIPAA).

185. Defendant also benefits from the Tracking Technologies on the Website, as data from these Tracking Technologies allow Defendant to identify

groups or segments among its insureds, and refine marketing to increase enrollment and revenue.

186. Defendant's Website has a number of public-facing subpages, including a search bar, a "Find Care" search engine that can be searched as a guest, and member resources that allow insureds to learn about plans and benefits.

187. Defendant operates a primary patient portal (the "Main Portal") at the web domain of my2.humana.com. After insureds enter their login credentials, they can review medical treatment options, retrieve information regarding their medical benefits, and access summaries of their health visits, among other actions involving highly sensitive, private health data.

188. Insureds seeking to locate a pharmacy or update their prescriptions are directed within the Main Portal to centerwellpharmacy.com (the "Prescription Portal").

189. CenterWell Pharmacy is a Humana company that serves as the sole pharmacy benefit manager (i.e., a type of company that manages prescription drug benefits for health insurers) for Defendant.

190. Insureds are not prompted to re-enter their login credentials upon transfer to the Prescription Portal, nor do they receive notice that they are being redirected.

191. Eligible Humana Medicare Advantage members seeking behavioral health and wellness resources are redirected to the web address

go365medicare.mpulse.com (the "Wellness Portal"), a healthy living and learning program.[66]

192. Within the Wellness Portal, insureds search for providers or programs targeted at specific behavioral conditions and ailments.

193. As with the Prescription Portal, insureds are not prompted to re-enter their login credentials upon transfer to the Wellness Portal; however, they do receive notice that they are being redirected:




*Figure 1* [67]

194. Within Defendant's allegedly secure patient portals, Third-Party Vendors have installed cookies that collect information about what people do on the Website and send it to other companies without the insureds knowing.

---

[66] *Go365 wellness & rewards*, HUMANA INC., https://www.humana.com/manage-your-health/achieving-health-goals/go-365 [https://perma.cc/75ZR-KZKL].
[67] The screenshot was taken from the Main Portal on transfer to the Wellness Portal.

195. Figure 2 shows several of these cookies. While not all of the owners of cookies are public information, several of the cookies included in Figure 2 belong to known Third-Party Vendors.

196. The "coveo" cookie highlighted in Figure 2 belongs to the Third-Party Vendor Coveo, which has embedded additional tracking within Humana's patient portal.

197. Additionally, the "AMCV" and "AMCVS" cookies are operated by Adobe and assign insureds a unique ID to track and transmit their actions back to Adobe's servers.[68]

198. The "_4c_" cookie is publicly identified within another website's privacy policy as belonging to third party ForeSee.[69] ForeSee collects information about how people use the website, as further explained *infra*.[70]

199. There are also cookies from tracking entities that are not described in this pleading, but also appear to collect and transmit the private health information of Defendant's insureds. Some trackers are not apparent at first because they use technical names, they load only at certain times, or they are hidden inside other website tools.

---

[68] *Cookies and the Experience Cloud Identity Service*, ADOBE EXPERIENCE CLOUD, https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies [https://perma.cc/KDG3-K6UB].
[69] Fanatics International Cookie Policy, FANATICS, LLC., https://f1store.formula1.com/en/cookie-policy/ch-1376 [https://perma.cc/F5E9-T8VS].
[70] *Predictive Modeling*, VERINT SYS., INC., https://www.verint.com/voice-of-the-customer/predictive-modeling/ [https://perma.cc/3L2W-72LR].

200. For instance, the "_gcl_au" cookie belongs to Google's Advertisement platform.[71] According to Google's own website, "_gcl_au" is used for analytics and advertising purposes.[72]

**Request Cookies** ☐ show filtered out request cookies

| Name | Value | Domain | Path | Expires / M... | Size |
|---|---|---|---|---|---|
| _4c_ | %7B%22_4c... | .humana.com | / | 2026-11-20... | 68 |
| _abck | F5DADD937... | .humana.com | / | 2026-10-16... | 516 |
| _gcl_au | 1.1.1601474... | .humana.com | / | 2026-01-12... | 32 |
| adcloud | {%22_les_v... | .humana.com | / | 2026-11-20... | 59 |
| AMCV_EFA0... | 179643557... | .humana.com | / | 2026-11-20... | 264 |
| AMCVS_EFA... | 1 | .humana.com | / | Session | 42 |
| apex__Sessi... | 2AA13FED3... | .humana.com | / | Session | 47 |
| apex__Unifi... | krKSBAdy65... | .humana.com | / | Session | 150 |
| ASP.NET_Se... | uz5wj5vfv3l... | .humana.com | / | Session | 41 |
| bm_sz | 2CF6D7C40... | .humana.com | / | 2025-10-16... | 474 |
| coveo_visito... | 74de7c01-f... | .humana.com | / | 2026-10-14... | 51 |
| DirectConn... | https://slser... | .humana.com | / | Session | 92 |
| dtCookie | v_4_srv_59_... | .humana.com | / | Session | 164 |
| dtPC | 59$243545... | .humana.com | / | Session | 60 |
| dtSa | | .humana.com | / | Session | 5 |
| FINDCARE_... | eyJhbGciOiJ... | .humana.com | / | 2025-10-16... | 203 |
| hum_keyco... | 0805010007 | .humana.com | / | 2025-10-17... | 28 |
| hum_phone... | 1-888-371-... | .humana.com | / | 2025-10-17... | 31 |
| hum_refer_... | findcare:_m... | .humana.com | / | Session | 36 |
| invoca_sessi... | %7B%22ttl... | .humana.com | / | 2026-11-20... | 230 |
| iPlanetDirec... | krKSBAdy65... | .humana.com | / | Session | 133 |
| kndctr_EFA0... | va6 | .humana.com | / | 2025-10-16... | 51 |

*Figure 2* [73]

201. Likewise, the "invoca" cookie highlighted in Figure 2 belongs to the Third-Party Vendor Invoca, which focuses on gathering data for online and offline advertising.[74]

---

[71] *Our advertising and measurement cookies*, GOOGLE, https://business.safety.google/adscookies/ [https://perma.cc/F4VJ-FHKY].
[72] *Id.*
[73] *Emphasis added* (screenshot was taken from the Main Portal).
[74] *Invoca homepage*, INVOCA INC., https://www.invoca.com/ [https://perma.cc/ZC7Z-WMDH].

## B. Defendant Enables Coveo's Tracking Technologies on Defendant's Purportedly "Secure" Patient Portals

### 1. Coveo's Role and Capabilities

202. Defendant has embedded the Tracking Technologies of Third-Party Vendor Coveo within its secure patient portal in order to enable the interception and collection of insureds' private data and communications, including health-related queries, without insureds' consent.

203. Coveo is a cloud-based platform employing a series of artificial intelligence tools intended to deliver relevant, personalized content and recommendations to insureds as they interface with websites.[75]

204. Coveo boasts the ability of its intelligent search platform to "understand[] intent in [users'] language and behavior."[76]

205. In other words, Coveo uses artificial intelligence to watch how people type, search, and click so it can predict what they want and show them personalized suggestions.

206. Coveo customers have the opportunity to plug its predictive search tool[77] directly into their websites, internal systems, and customer-service software. This lets Coveo gather and organize data about everything users search for, making it easy for the company to track and index those searches.

---

[75] *Coveo AI-Relevance Platform*, COVEO, https://www.coveo.com/en/platform [https://perma.cc/4WYA-CAFQ].
[76] *Coveo Intelligent Search*, COVEO, https://www.coveo.com/en/platform/intelligent-search [https://perma.cc/G8B9-8R4Z].
[77] *Id.*

207. Similarly, Coveo encourages customers to connect its tool to other platforms like Amazon Web Services, Salesforce, and Zendesk to compile databases and centralize searchable user data.[78]

208. One subpage of Coveo's website details its work in the healthcare industry, touting its ability to provide partners with a "full view of a [healthcare network] member's digital journey."[79] Coveo highlights that it can give companies like Humana a "full view" of a patient or member's online activity.

209. Importantly, Coveo specifically identifies Humana as among the billion-dollar enterprises that "rely on Coveo AI-Search":[80]




*Figure 3* [81]

[78] *Integrations & Connectors*, COVEO, https://www.coveo.com/en/integrations#filter=integration%20and%20connector%20types&page=2 [https://perma.cc/8K5J-GLWA].
[79] *Industries: Healthcare*, COVEO, https://www.coveo.com/en/industries/healthcare [https://perma.cc/R3EH-6JB4].
[80] *Id.*
[81] *Id.*

2. Coveo's Tracking in the Main Portal and Public Pages of Website

210. Coveo is embedded in Defendant's patient portal and tracks insureds in real time.

211. The "Prescription" subpage of the Main Portal enables insureds to perform a drug search after entering their login credentials to explore coverage and availability. When an insured manually enters "Ozempic," a drug widely known for its off-label use for weight loss, into the search box, Coveo makes the following request:




*Figure 4* [82]

[82] The screenshot was taken from the "Prescriptions" subpage of the Main Portal.




*Figure 5* [83]

212. As shown in Figures 4 and 5, information about the insured's sensitive drug search is intercepted by https://static.cloud.coveo.com/atomic/v2/p-e1255160.js, a domain that transmits the insured's data to Coveo to be stored in its Content Delivery Network, a large database where Coveo stores and analyzes the data for Humana.

213. Coveo also embeds similar Tracking Technologies on the public-facing Website, assigning insureds personal identifiers linking them to a unique profile even before they enter their credentials to access their patient portal.

[83] The screenshot was taken from the "Prescriptions" subpage of the Main Portal.

214. For example, when an insured performs a Medicare drug search on the public-facing Website using Humana's Rx Calculator tool[84] and enters "Zoloft," a prescribed antidepressant, into the search field, a Coveo cookie assigns the visitor a unique ID starting with the digits and letters of "74de7c01" and begins constructing a profile of the insured:




*Figure 6* [85]

[84] *RX Calculator*, HUMANA INC., https://rxcalculator.humana.com/medicaredrugsearch/build-drug-list [https://perma.cc/LF2N-W38F].

[85] This screenshot was taken from a drug search bar on the public-facing Website.




*Figure 7* [86]

## C. Defendant Enables Tealium's Tracking Technologies on Defendant's Website

### 1. Tealium's Role and Capabilities

215. Defendant has embedded the Tracking Technologies of Third-Party Vendor Tealium on the Website to enable the interception and collection of insureds'

---

[86] *Emphasis added* (this screenshot was taken from a drug search bar on the public-facing Website).

private data and communications, including health-related queries, without insureds' consent.

216. Tealium is a customer data platform and tag management system based in San Diego, California that helps businesses track and organize information about their users. It provides tools that allow companies to collect data from many places and store the data in one system.

217. Tealium advertises that it can "collect [user] data, ensure data quality, and send it anywhere" in real time.[87] Tealium's AudienceStream tool allows its customers, like Humana, to "[t]urn disparate [user] data silos into actionable [user] profiles." Tealium encourages companies to integrate this tool with other advertising and tracking companies such as The Trade Desk, Adobe, Google, and Criteo to "quickly and effectively connect your systems and data."[88]

---

[87] *Products: Real-time data collection and data quality*, TEALIUM, https://tealium.com/products-real-time-data-collection-and-quality/ [https://perma.cc/5NBW-WKS2].

[88] *Products: Real-time CDP and Predictive Insights*, TEALIUM, https://tealium.com/products-real-time-cdp-predictive-insights/ [https://perma.cc/KER8-YNVP].




*Figure 8* [89]

2. Tealium's Tracking Within Main Portal with Use of Unique ID

218. Tealium's embedded code on Defendant's Website harvests detailed personal and private information of Humana insureds, including the exact keywords searched and insureds' interactions with the Website.

219. Tealium requests usually appear within request URLs containing Humana, such as https://pc-humana-collect.tealiumiq.com. For instance, the below request is served when an insured reaches a Website subpage entitled "Transplant Care":

[89] *Id.*




*Figure 9* [90]

220. Figure 9 displays a request with an embedded TAPID cookie (a type of cookie that enables identification of specific users) that assigns the insured a unique ID, which is subsequently served to AudienceStream.[91]

221. A request from an identical URL, also including an embedded TAPID cookie, loads when an insured enters "diabetes" in the main search field on the Main Portal landing page, assigning the insured a unique identifier that captures their private medical concerns and directly transmits this information to AudienceStream.

---

[90] *Emphasis added* (this screenshot was taken from the Transplant Care subpage).

[91] *Tealium Documentation: About TAPID cookies*, TEALIUM, https://docs.tealium.com/server-side/visitor-stitching/tapid/ [https://perma.cc/RRM6-T9AV].




*Figure 10* [92]

▾ General

Request URL: https://pc-humana-collect.tealiumiq.com/humana/main/2/i.gif
Request Method: POST
Status Code: 200 OK
Remote Address: 52.86.156.254:443
Referrer Policy: strict-origin-when-cross-origin

▾ Response Headers

Access-Control-Allow-Credentials: true
Access-Control-Allow-Origin: https://my2.humana.com
Access-Control-Expose-Headers: X-Region
Cache-Control: no-transform,private,no-cache,no-store,max-age=0,s-maxage=0
Content-Length: 43
Content-Type: image/gif
Date: Thu, 16 Oct 2025 19:24:20 GMT
Expires: Thu, 16 Oct 2025 19:24:20 GMT
P3p: policyref="/w3c/p3p.xml", CP="NOI DSP COR NID CUR ADM DEV OUR BUS"
Pragma: no-cache
Set-Cookie: TAPID=humana/main>0199e3bd1d82001939e86d8d942e0506f001706700bd0|humana/cwpa>0199e42a637400147b7970b9057e0506f002306700bd0|grubhubseamless/grubhub>0199169dff1b001bd56d76d372b80506f005f067009d8|epson/northamerica>01991acfc630000cab57ddb6c2a40506f006c06700bd0|providence/main>01983d647b1f001db3b6d12dbead0506f003206700bd0|; Path=/; Domain=.tealiumiq.com; Expires=Fri, 16-Oct-2026 19:24:20 GMT; Max-Age=31536000; Secure; HttpOnly; SameSite=None
Set-Cookie: tcs.google_cver=eyJlcHNvbi9ub3J0aGFtZXJpY2EiOiIxfDE3NTcxMDMwMjYwMzEifQ==; Path=/; Domain=.tealiumiq.com; Expires=Thu, 16-Apr-2026 19:24:20 GMT; Max-Age=15724800; Secure; HttpOnly; SameSite=None
Set-Cookie: tcs.google_gid=eyJlcHNvbi9ub3J0aGFtZXJpY2EiOiJDQUVTRUFGOFlrbzdiYWU4a2s3eWpQWmlrWGd8MTc1NzEwMzAyNjAzMSJ9; Path=/; Domain=.tealiumiq.com; Expires=Thu, 16-Apr-2026 19:24:20 GMT; Max-Age=15724800; Secure; HttpOnly; SameSite=None

*Figure 11* [93]

[92] This screenshot was taken from the search bar on the Main Portal.
[93] *Emphasis added* (this screenshot was taken from Main Portal's search bar).

222. The above Figures 10 and 11 show how Tealium obtained the highly sensitive health-related information of insureds with the intent of using the information it obtained for commercial gain through targeted advertising, because the data is connected with cookies to unique individuals.

223. In addition, the following code from Defendant's Website shows how highly sensitive, private, personal data – in this case, an insured's search for "migraine" in the search field on the Main Portal landing page – are intercepted by Tealium:

```
:authority          pc-humana-visitor-service-us-east-1.tealiumiq.com
:method             GET
:path               /humana/main/0199e3bd1d82001939e86d8d942e0506f001706700bd0?
                    callback=utag.ut%5B%22writevamain%22%5D&rnd=1760642097222
:scheme             https
Accept              */*
Accept-Encoding     gzip, deflate, br, zstd
Accept-Language     en-US,en;q=0.9
Cookie              tcs.google_cver=eyJlcHNvbi9ub3J0aGFtZXJpY2EiOilxfDE3NTcxMDMwMjYwMzEifQ==;
                    tcs.google_gid=eyJlcHNvbi9ub3J0aGFtZXJpY2EiOiJDQUVTRUFGOFlrbzdiYWU4a2s3eWpQWmlrWGd8MTc1NzEwMzAyNjAzMSJ
                    9;
                    TAPID=humana/main>0199e3bd1d82001939e86d8d942e0506f001706700bd0|humana/cwpa>0199e42a637400147b7970b905
                    7e0506f002306700bd0|grubhubseamless/grubhub>0199169dff1b001bd56d76d372b80506f005f067009d8|epson/northamerica
                    >01991acfc630000cab57ddb6c2a40506f006c06700bd0|providence/main>01983d647b1f001db3b6d12dbead0506f003206700b
                    d0|
Referer             https://my2.humana.com/
Sec-Ch-Ua           "Google Chrome";v="141", "Not?A_Brand";v="8", "Chromium";v="141"
Sec-Ch-Ua-Mobile    ?0
```

*Figure 12* [94]

224. Figure 12 shows how, after an insured searches for "migraine," Defendant's Website loads third-party tracking code from Tealium by issuing a request to a Tealium-controlled domain, https://pc-humana-visitor-service-us-east-1.tealiumiq.com.

---

[94] *Emphasis added* (this screenshot was taken from Main Portal's search bar).

225. This domain specifically points to Tealium iQ, Tealium's Customer Data Hub, which allows customers to deploy and manage vendor tags, manage customer data, and better control their marketing technology stack.[95]

226. Upon reaching the Main Portal subpage displaying search results, the insured is assigned a unique identifier via the installation of another TAPID cookie, allowing Defendant and Third-Party Vendors to persistently identify and monitor the insured across sessions or pages, and to build a behavioral profile with a specific audience, a current visit ID, and an ID from past sessions:




*Figure 13* [96]

## D. Defendant Enables Adobe's Tracking Technologies on Defendant's Purportedly "Secure" Patient Portals

### 1. <u>Adobe's Role and Capabilities</u>

227. Adobe is another Third-Party Vendor for which Defendant has embedded Tracking Technologies that enable Adobe to harvest the private data of insureds when logged into their secure patient portal for marketing and commercial purposes, without adequately disclosing this fact to insureds or obtaining consent.

---

[95] *Products: Tealium TiQ Tag Management*, TEALIUM, https://tealium.com/products/tealium-iq-tag-management-system/ [https://perma.cc/UX5V-79LS].

[96] *Emphasis added* (this screenshot was taken from the Main Portal's search bar).

228. Adobe is a software company headquartered in San Jose, California. While known for its products like Photoshop and Acrobat, it also operates several digital marketing and data analytics tools used to track behavior across websites.

229. These data products include Adobe Analytics,[97] Adobe Experience Platform,[98] and Adobe Audience Manager,[99] which all use Tracking Technologies like beacons, pixels, JavaScript tags, cookies, and Session Replay Code to capture data in real-time.

230. Defendant embedded Adobe's Tracking Technologies on the Website.

231. Defendant's embedding of Adobe's code on the secure patient portal within the Website allowed Adobe to surreptitiously harvest data about insureds' visits, including keyword searches, and potentially match these data to offline profiles.

2. <u>Adobe's Tracking of Content in the Main Portal Under "SMetrics"</u>

232. Adobe's interceptions on the Website are often executed under the domain smetrics.humana.com, which is Adobe's analytics collection server.

---

[97] *Adobe Analytics*, ADOBE FOR BUSINESS, https://business.adobe.com/products/adobe-analytics.html [https://perma.cc/MX45-HTSE].

[98] *Adobe Experience Manager*, ADOBE FOR BUSINESS, https://business.adobe.com/products/experience-manager/sites/aem-sites.html [https://perma.cc/3X55-WWKT].

[99] *Adobe Audience Manager*, ADOBE FOR BUSINESS, https://business.adobe.com/products/audience-manager/adobe-audience-manager.html [https://perma.cc/C5DG-89MH].

233. For example, when an insured manually enters “Ozempic,” into the search box on the “Prescriptions” subpage of the Main Portal, Adobe makes a request reflecting the *full and exact* search term:




*Figure 14* [100]

234. Not only does the request include the insured’s search query (i.e., “Ozempic”), but also the page location and parameters regarding the insured’s browser, like cookies, which allow Adobe to link the insured’s sensitive search for weight loss to a unique profile and monitor their behavior across the Internet.

235. A similar request occurs when an insured manually enters “diabetes” in the Main Portal’s main search field, which is subsequently reflected in the request URL in its entirety:

---

[100] *Emphasis added* (screenshot was taken from Prescriptions subpage of Main Portal).

| | |
|---|---|
| Request URL | https://smetrics.humana.com/b/ss/humanainctemp/1/JS-2.27.0/s26084074309490?AQB=1&ndh=1&pf=1&t=16%2F9%2F2025%2014%3A22%3A45%204%20300&sdid=7685A283FBBE416E-65220757590E6513&mid=29682918877422254642264730793016204126&aamlh=7&ce=UTF-8&cdp=2&pageName=member%20portal%3A%20search%20results&g=https%3A%2F%2Fmy2.humana.com%2Fdashboard&cc=USD&ch=members&server=my2.humana.com&c1=member%20portal%3A%20search%20results&v1=member%20portal%3A%20search%20results&c2=14&c3=4&c4=22&c5=10&c6=2025&c7=16&c8=search%20results&c10=%20search%20results%20&v10=0199e3bd1d82001939e86d8d942e0506f001706700bd0&c12=member_portal%3A_search_results&v13=1760641840885&c14=10_16_2025&v14=false&c15=14%3A22%3A45&v15=false&c16=0805010007&v16=0805010007&c17=english&v17=english&c18=n&v18=n&c19=member%20portal&v19=member%20portal&c20=members&v20=members&c21=262&c22=3704&v23=my2.humana.com&v24=external&v26=false&c27=member_portal%3A_search_results&v28=0&c34=body&c35=dhpsearchbtn&c36=secondary%20cta&c38=button&c44=1343_link102&v44=1343_link102&v47=false&c51=diabetes&c52=2&c54=0&c60=my2.humana.com%2Fsearch-results&v60=my2.humana.com%2Fsearch-results&c61=my2.navlink.new%7Cmy2.renewal.a%7Cmy2.003.25.c%7Cpcp_change_eligible%7Cawv_pcp_variation&v61=my2.navlink.new%7Cmy2.renewal.a%7Cmy2.003.25.c%7Cpcp_change_eligible%7Cawv_pcp_variation&c71=2025-10-16t14%3A22%3A45&v71=2025-10-16t14%3A22%3A45&c73=%2Fsearch-results&v73=%2Fsearch-results&c74=https%3A%2F%2Fmy2.humana.com%2Fsearch-results%3Fq%3Ddiabetes&v74=https%3A%2F%2Fmy2.humana.com%2Fsearch-results%3Fq%3Ddiabetes&c75=29682918877422254642264730793016204126&v75=29682918877422254642264730793016204126&pe=lnk_o&pev2=dhpsearchbtn&s=1536x960&c=24&j=1.6&v=N&k=Y&bw=767&bh=826&mcorgid=EFA02CAD546E88360A4C98C6%40AdobeOrg&lrt=52&AQE=1 |
| Request Method | GET |
| Status Code | 200 OK |
| Remote Address | 63.140.39.114:443 |

*Figure 15* [101]

236. Moreover, when an insured selects "see details" on a tile displaying the credentials of a mental health counselor, Dawn Clark, as the insured searches for tailored care within the Main Portal, information associated with this sensitive interaction, including the full name of the counselor, is transmitted to Adobe within the URL of an smetrics request:

[101] *Emphasis added* (this screenshot was taken from Main Portal's search bar).

▼ General

| | |
|---|---|
| Request URL | https://smetrics.humana.com/b/ss/humanainctemp/1/JS-2.27.0/s29646881911446?AQB=1&ndh=1&pf=1&t=16%2F9%2F2025%2014%3A44%3A23%204%20300&sdid=2313188BFF047ED4-597FA669E553BDF1&mid=29682918877422254642264730793016204126&aamlh=7&ce=UTF-8&cdp=2&pageName=findcare%3A%20medical&g=https%3A%2F%2Ffindcare.humana.com%2Ftype-of-care&cc=USD&ch=findcare&server=findcare.humana.com&c1=findcare%3A%20medical&v1=findcare%3A%20medical&c2=14&c3=44&c4=44&c5=10&c6=2025&c7=16&c8=provider%20results%20-%20humana%20page%20-%201&v10=0199e3bd1d82001939e86d8d942e0506f001706700bd0&c11=110_evergreen_st_port_gibson_ms_39150%7Cmedicare_ppo%7Cautopop_y%7Call%7Cmental_health_counselor%7Cprediction%7C4310004767522&c12=findcare%3A_medical&v13=1760641840885&c14=10_16_2025&v14=false&c15=14%3A44%3A23&v15=false&c16=0805010007&v16=0805010007&c17=english&v17=english&c18=n&v18=n&c19=findcare&v19=findcare&c20=findcare&v20=findcare&c21=411&c22=6791&v23=findcare.humana.com&v24=external&v26=false&c27=findcare%3A_medical&c34=body&c35=clark%20dawn%20lmhc&c36=secondary%20cta&c38=link&c44=1492_link101&v44=1492_link101&v47=false&c60=findcare.humana.com%2Fmedical&v60=findcare.humana.com%2Fmedical&c61=result_card_fc&v61=result_card_fc&c71=2025-10-16t14%3A44%3A23&v71=2025-10-16t14%3A44%3A23&c73=%2Fmedical&v73=%2Fmedical&c74=https%3A%2F%2Ffindcare.humana.com%2Fmedical%3Fview%3Dresults%26page%3D1%26results%3D20&v74=https%3A%2F%2Ffindcare.humana.com%2Fmedical%3Fview%3Dresults%26page%3D1%26results%3D20&c75=29682918877422254642264730793016204126&v75=29682918877422254642264730793016204126&pe=lnk_o&pev2=clark%20dawn%20lmhc&c.&a.&activitymap.&page=findcare%3A%20medical&link=Clark%2C%20Dawn%20LMHC&region=findcare-results-map&pageIDType=1&.activitymap&.a&.c&pid=findcare%3A%20medical&pidt=1&oid=Clark%2C%20Dawn%20LMHC&oidt=3&ot=SUBMIT&s=1536x960&c=24&j=1.6&v=N&k=Y&bw=1536&bh=826&mcorgid=EFA02CAD546E88360A4C98C6%40AdobeOrg&lrt=73&AQE=1 |
| Request Method | GET |
| Status Code | 200 OK |
| Remote Address | 63.140.38.77:443 |

*Figure 16* [102]

237. Adobe executes a similar request when an insured types "Therapy" into the search field on the "Benefits" subpage of the Main Portal. The smetrics.humana.com request URL captures the insured's *full and exact* search term:

[102] *Emphasis added* (this screenshot was taken from the Main Portal).

| | |
|---|---|
| Request URL | https://smetrics.humana.com/b/ss/humanainctemp/1/JS-2.27.0/s28991848432604?AQB=1&ndh=1&pf=1&t=16%2F9%2F2025%2014%3A29%3A23%204%20300&sdid=2743ABB69B30BB9E-5907C1D4E204695B&mid=29682918877422254642264730793016204126&aamlh=7&ce=UTF-8&cdp=2&pageName=member%20portal%3A%20coverages%20%7C%20plan%20benefits&g=https%3A%2F%2Fmy2.humana.com%2Fdashboard&cc=USD&ch=members&server=my2.humana.com&c1=member%20portal%3A%20coverages%20%7C%20plan%20benefits&v1=member%20portal%3A%20coverages%20%7C%20plan%20benefits&c2=14&c3=4&c4=29&c5=10&c6=2025&c7=16&c8=plan%20benefits&c10=plan%20benefits&v10=0199e3bd1d82001939e86d8d942e0506f001706700bd0&c12=member_portal%3A_coverages_%7C_plan_benefits&v13=1760641840885&c14=10_16_2025&v14=false&c15=14%3A29%3A23&v15=false&c16=0805010007&v16=0805010007&c17=english&v17=english&c18=n&v18=n&c19=member%20portal%3A%20coverages&v19=member%20portal%3A%20coverages&c20=members&v20=members&c21=446&c22=4605&v23=my2.humana.com&v24=external&v26=false&c27=member_portal%3A_coverages_%7C_plan_benefits&v28=0&c34=search_box&c35=search&c36=secondary_cta&c38=button&c44=e2_firepvtagspa&v44=e2_firepvtagspa&v47=false&c51=therapy&c52=24&c54=0&c60=my2.humana.com%2Fcoverages%2Fplan-benefits&v60=my2.humana.com%2Fcoverages%2Fplan-benefits&c61=my2.navlink.new%7Cmy2.renewal.a%7Cmy2.003.25.c%7Cpcp_change_eligible%7Cawv_pcp_variation%7Ccol_compliant%7Cbcs_compliant&v61=my2.navlink.new%7Cmy2.renewal.a%7Cmy2.003.25.c%7Cpcp_change_eligible%7Cawv_pcp_variation%7Ccol_compliant%7Cbcs_compliant&c71=2025-10-16t14%3A29%3A23&v71=2025-10-16t14%3A29%3A23&c73=%2Fcoverages%2Fplan-benefits&v73=%2Fcoverages%2Fplan-benefits&c74=https%3A%2F%2Fmy2.humana.com%2Fcoverages%2Fplan-benefits&v74=https%3A%2F%2Fmy2.humana.com%2Fcoverages%2Fplan-benefits&c75=29682918877422254642264730793016204126&v75=29682918877422254642264730793016204126&pe=lnk_o&pev2=search&s=1536x960&c=24&j=1.6&v=N&k=Y&bw=767&bh=826&mcorgid=EFA02CAD546E88360A4C98C6%40AdobeOrg&lrt=42&AQE=1 |
| Request Method | GET |
| Status Code | 200 OK |

*Figure 17* [103]

238. Another similar information transaction occurs with Adobe when an insured searches for information regarding "transplant care," a serious medical procedure, within the Main Portal. Additionally, this transaction with Adobe transmits data implying that the insured was determining if their health insurance would cover this medical procedure, member%20portal%3A%20coverages&v19.

---

[103] *Emphasis added* (this screenshot was taken from the Main Portal).



▾ General

Request URL
https://smetrics.humana.com/b/ss/humanainctemp/1/JS-2.27.0/s23181069171160?AQB=1&ndh=1&pf=1&t=16%2F9%2F2025%2014%3A53%3A52%204%20300&sdid=3032CACE30DC2E07-5A2B5F148904DBD1&mid=29682918877422254642264730793016204126&aamlh=7&ce=UTF-8&cdp=2&pageName=member%20portal%3A%20coverages%20%7C%20health%20programs&g=https%3A%2F%2Fmy2.humana.com%2Fdashboard&cc=USD&ch=members&server=my2.humana.com&c1=member%20portal%3A%20coverages%20%7C%20health%20programs&v1=member%20portal%3A%20coverages%20%7C%20health%20programs&c2=14&c3=4&c4=53&c5=10&c6=2025&c7=16&c8=health%20programs&c10=health%20programs&v10=0199e3bd1d82001939e86d8d942e0506f001706700bd0&c12=member_portal%3A_coverages_%7C_health_programs&v13=1760641840885&c14=10_16_2025&v14=false&c15=14%3A53%3A52&v15=false&c16=0805010007&v16=0805010007&c17=english&v17=english&c18=n&v18=n&c19=member%20portal%3A%20coverages&v19=member%20portal%3A%20coverages&c20=members&v20=members&c21=311&c22=4631&v23=my2.humana.com&v24=external&v26=false&c27=member_portal%3A_coverages_%7C_health_programs&v28=0&c34=body&c35=explore%20transplant%20care&c36=secondary%20cta&c38=button&c44=1343_link102&v44=1343_link102&v47=false&c60=my2.humana.com%2Fcoverages%2Fhealth-programs&v60=my2.humana.com%2Fcoverages%2Fhealth-programs&c61=my2.navlink.new%7Cmy2.renewal.a%7Cmy2.003.25.c%7Cawv_pcp_variation&v61=my2.navlink.new%7Cmy2.renewal.a%7Cmy2.003.25.c%7Cawv_pcp_variation&c71=2025-10-16t14%3A53%3A52&v71=2025-10-16t14%3A53%3A52&c73=%2Fcoverages%2Fhealth-programs&v73=%2Fcoverages%2Fhealth-programs&c74=https%3A%2F%2Fmy2.humana.com%2Fcoverages%2Fhealth-programs&v74=https%3A%2F%2Fmy2.humana.com%2Fcoverages%2Fhealth-programs&c75=29682918877422254642264730793016204126&v75=29682918877422254642264730793016204126&pe=lnk_o&pev2=explore%20transplant%20care&s=1536x960&c=24&j=1.6&v=N&k=Y&bw=562&bh=826&mcorgid=EFA02CAD546E88360A4C98C6%40AdobeOrg&lrt=54&AQE=1

Request Method GET

Status Code 200 OK

Remote Address 63.140.38.77:443

Referrer Policy strict-origin-when-cross-origin

*Figure 18* [104]

239. Not only does Adobe surreptitiously capture information associated with insureds' interactions within the Main Portal such as page location, clicks, and insureds' search terms, but it also embeds cookies within certain requests assigning multiple persistent identifiers to individual insureds that can be used to link them to a digital profile and track them across sessions and the Internet.

240. For example, when an insured visits the "Prescription" subpage of the Main Portal, an Adobe request assigns multiple persistent identifiers via third-party cookies such as coveo_visitorid (Coveo), AMCVS (Adobe), _gcl_au (Google Ads), and utag_main_v_id (Tealium).

241. Coveo identifies the insured in the below request via a string of characters beginning "74de7c01":

---

[104] *Emphasis added* (this screenshot was taken from the Main Portal).

| | |
|---|---|
| :authority | smetrics.humana.com |
| :method | POST |
| :path | /ee/va6/v1/interact?configId=f635dc18-90ea-44b2-8736-4bee94a36726&requestId=7c1a1862-a4be-4ef2-9d08-3498df64629d |
| :scheme | https |
| Accept | */* |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Cache-Control | max-age=0 |
| Content-Length | 2718 |
| Content-Type | text/plain; charset=UTF-8 |
| Cookie | rxVisitor=1760462442732A06QU8OUV8I5U848AIQKR0N2H3LUL4O0; coveo_visitorId=74de7c01-fb09-4175-86f9-83dee2101d76; utag_main_vapi_domain=humana.com; _gcl_au=1.1.1601474682.1760462446; AMCVS_EFA02CAD546E88360A4C98C6%40AdobeOrg=1; uws_storage=%22cookie%22; utag_main_v_id=0199e3bd1d82001939e86d8d942e0506f001706700bd0; _4c_=%7B%22_4c_mc_%22%3A%22adecd139-7347-4fbe-8e92-9279fa5d2ead%22%7D; s_cc=true; SSID_USvD=CQ8fsB0AAAAAAACGoe5owjCAJYah7mgBAAAAAAAAAAAAhqHuaAA16A; SSSC_USvD=1055.G7561158421928489154.1\|0.0; SSRT_USvD=h6HuaAADAA; DirectConnect=https://slservices.humana.com/rearchitect/Logon/DirectConnectLogin.aspx?dcPO=19; uws_story_tfecntpd=%7B%22done%22%3Afalse%2C%22stopped%22%3Atrue%7D%7C1765653500660; s_fid=4EBF5A92BB5A9E3D-3D734DCD21771A6E; QuantumMetricUserID=3162390c84af7d59a7ff91258171034c; ASP.NET_SessionId=uz5wj5vfv3lrvgwj5ilbsfur; SSID=CQDL3x0qAAAAAABqhu5o83ICGmqG7mgDAAAAAAAAAAAAMEPxaAA16CggAQEw8SQAMEPxaAEAckcBAUSJKAAwQ_FoAQAMRQEBy1coAD8D8WgBAA; SSSC=525.G7561128614662664947.3\|73768.2421040:83212.2643915:83826.2656580; SSRT=MEPxaAADAA; hum_keycode_cookie=0805010007; hum_phoneno=1-888-371-9538%3A711; utag_main__sn=3; utag_main_ses_id=1760641840885%3Bexp-session; SSOD=AKpdAAAAEgD4Zy4AFQAAAGqG7mgwQ_FoAQAWAAkAKRhMABTUMuwaCQBgn0wAFNQy7Bo; utag_main_adobe_mcid=29682918877422254642264730793016204126%3Bexp-session; utag_main_aa_vid=%3Bexp-session; utag_main_dc_visit=3; AMCV_EFA02CAD546E88360A4C98C6%40AdobeOrg=179643557%7CMCIDTS%7C20378%7CMCMID%7C29682918877422254642264730793016204126%7CMCAAMLH-1761246643%7C7%7CMCAAMB-1761246643%7CRKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3xzPWQmdj0y%7CMCOPTOUT-1760649043s%7CNONE%7CvVersion%7C5.5.0; utag_main_dc_region=us-east-1%3Bexp-session; adcloud={%22_les_v%22:%22c%2Cy%2Chumana.com%2C1760643643%22}; uws_prop_79vot5pa=%22N%22%7Ct; uws_prop_krdupivs=%22N%22%7Ct; uws_prop_0armfn3e=%22N%22%7Ct; uws_prop_7aqg3knr=%22N%22%7Ct; uws_prop_bqt8vgxn=%22N%22%7Ct; uws_prop_hh1wmc93=%22N%22%7Ct; uws_prop_r13nvs14=%22N%22%7Ct; uws_prop_h4tkzepv=%22N%22%7Ct; uws_prop_bl76u09l=%22%22%7Ct; uws_prop_1nh1xyxo=%22%22%7Ct; uws_prop_nopa1hto=%220199e3bd1d82001939e86d8d942e0506f001706700bd0%22%7Ct; |

*Figure 19* [105]

242. This request directly transmits the insured's actions as they explore prescription options for the duration of their visit to Adobe Experience Cloud servers.

243. In sum, through a variety of tracking tools, Adobe harvests data from Plaintiffs and Defendant's insureds for commercial gain.

---

[105] *Emphasis added* (this screenshot was taken from the Prescriptions subpage of the Main Portal).

### E. Defendant Enables ForeSee's Tracking Technologies on Defendant's Purportedly "Secure" Patient Portals

#### 1. ForeSee's Role and Capabilities

244. Defendant has embedded the Tracking Technologies of Third-Party Vendor ForeSee (now Verint) within the secure Main Portal of the Website enabling the interception and collection of users' private data and communications, including health-related queries, without consent.

245. ForeSee was a provider of customer experience analytics headquartered in Ann Arbor, Michigan, which marketed and deployed an analytics platform that collected a wide range of user data on behalf of its clients like Humana.[106]

246. ForeSee was acquired by Verint Systems, Inc. in December 2018, but the acquisition did not alter ForeSee's tracking methods, which continue to operate in the same manner to collect and analyze user information.[107]

247. ForeSee's tools enable real-time tracking of user interactions across the Website, including personally identifiable information like name, email address, and phone number.

#### 2. ForeSee's Tracking in the Main Portal

248. ForeSee beings tracking as soon as a user enters their login credentials and accesses the landing page of their MyHumana account in the Main Portal:

---

[106] *Predictive Modeling*, VERINT SYS., INC., https://www.verint.com/voice-of-the-customer/predictive-modeling/ [https://perma.cc/3L2W-72LR].
[107] *Ann Arbor's ForeSee Under New Ownership*, MLIVE (Dec. 17, 2018), available at https://www.mlive.com/news/ann-arbor/2018/12/ann-arbors-foresee-under-new-ownership.html [https://perma.cc/3QWL-3CN2].




*Figure 20* [108]

249. As seen in Figure 20, information associated with the insured's session within the Main Portal is surreptitiously gathered via this request executed by ForeSee.

250. This request transmits data to ForeSee's CX Suite tool, which is marketed to help companies "capture, visualize, analyze, collaborate, and act on the voice of a customer in a single, unified suite."[109]

---

[108] *Emphasis added* (this screenshot was taken from the Main Portal).

[109] *Foresee Revolutionizes Customer Experience Measurement with New Release of ForeSee CX Suite*, PR NEWSWIRE (Jul. 26, 2017), https://www.prnewswire.com/news-

251. In other words, ForeSee's software is designed to record and analyze what insureds do on the Website.

252. Insureds' tracked interactions can link them to sensitive PHI such as medical conditions, needs, and ailments.

253. For example, the above ForeSee request is duplicated when an insured visits various subpages of the Main Portal, such as "Transplant Care" on the under "Health Programs," when an insured manually types "Therapy" into the "Benefits" search field, and when an insured selects "See Details" on a tile displaying the credentials of a mental health counselor.

254. ForeSee also tracks what insureds do on the public-facing Humana website. Figure 21 shows ForeSee capturing an insured's search for transplant centers and transmitting these data back to ForeSee's servers.

releases/foresee-revolutionizes-customer-experience-measurement-with-new-release-of-foresee-cx-suite-300494361.html [https://perma.cc/UG7L-N5GL].

▼ General

| | |
|---|---|
| Request URL | https://analytics.foresee.com/ingest/events |
| Request Method | POST |
| Status Code | 200 OK |
| Remote Address | 3.215.146.35:443 |
| Referrer Policy | no-referrer-when-downgrade |

▼ Response Headers

| | |
|---|---|
| Access-Control-Allow-Origin | * |
| App-Info | fsevents 1.9.2 |
| Brain-Server-Version | 1.9.2 |
| Cache-Control | private, no-cache, no-store, must-revalidate |
| Content-Encoding | gzip |
| Content-Length | 60 |
| Content-Type | application/json; charset=UTF-8 |
| Date | Thu, 30 Oct 2025 21:12:32 GMT |
| Expires | -1 |
| Pragma | no-cache |
| Strict-Transport-Security | max-age=31536000; includeSubDomains |
| X-Xss-Protection | 0 |

▼ Request Headers

| | |
|---|---|
| :authority | analytics.foresee.com |
| :method | POST |
| :path | /ingest/events |
| :scheme | https |
| Accept | */* |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Content-Length | 2379 |
| Content-Type | application/json |
| Origin | https://www.humana.com |
| Priority | u=1, i |
| Referer | https://www.humana.com/manage-your-health/health-condition-management/national-transplant-network-locator |

*Figure 21* [110]

## F. Defendant Enables Quantum Metric's Tracking Technologies on Defendant's Purportedly "Secure" Patient Portals

### 1. <u>Quantum Metric's Role and Capabilities</u>

255. Defendant has embedded the Tracking Technologies of Third-Party Vendor Quantum Metric within its purportedly secure patient portals in order to enable the interception and collection of insureds' private data and communications, including health-related queries, without insureds' consent.

[110] This screenshot was taken from searches on public-facing pages of the Website.

256. Quantum Metric begins tracking immediately after insureds enter their usernames and passwords and log in to the Main Portal.

257. Quantum Metric is a digital analytics (i.e., marketing) service that captures user interaction data.[111] It provides a Digital Experience Analytics ("DXA") platform, marketed as "[capturing] insight from 40% of the world's internet users."[112]

258. DXA captures performance metrics like click-through rates (the percentage of people who clicked on something they saw on a website) with session replay: "Features like detailed session replays (showing exact user actions), heatmaps (visualizing popular areas on a page), and automatic 'friction detection' (spotting where users struggle) are becoming standard to truly understand how customers *feel* when using your digital services."[113]

259. Of note, Quantum Metric's tools are specifically advertised as allowing for tracking in real time, with the company stating that "real-time insights are crucial" and "this means looking at every single user interaction as it happens, not days later."[114]

---

[111] *Quantum Metric Recognized as Top Digital Experience Analytics Platform*, QUANTUM METRIC, https://www.quantummetric.com/resources/digital-experience-analytics-platforms-matrix [https://perma.cc/KUW7-BW8T].
[112] *Key DXA Trends Shaping the Market*, QUANTUM METRIC, https://www.quantummetric.com/events/key-dxa-trends-shaping-the-market [https://perma.cc/N6YH-JVTB].
[113] *What is Digital Experience Analytics? Your 2025 Guide*, QUANTUM METRIC BLOG (Jul. 10, 2025), https://www.quantummetric.com/blog/digital-experience-analytics-2025-guide [https://perma.cc/QHZ2-7EPS].
[114] *Id.*

2. Quantum Metric's Tracking in the Main Portal

260. Quantum Metric's Tracking Technologies are embedded throughout Defendant's Website, including in purportedly secure portals, and track insureds in real time.

261. As the Main Portal landing page loads, Quantum Metric's tracking script loads simultaneously.


▼ General

| | |
|---|---|
| Request URL | https://ingest.quantummetric.com/horizon/humana?T=B&u=https%3A%2F%2Ffindcare.humana.com%2Fmedical%3Fview%3Ddetails%26providerId%3D3548191&t=17606438802168&v=1760643880749&H=284bf168fcb14c56f260838a&s=1bd4158c22b9da09c07b5f6f5d3d86f6&U=3162390c84af7d59a7ff91258171034c&N=0&Q=2&S=0&b=633&z=1 |
| Request Method | POST |
| Status Code | 200 OK |
| Remote Address | 34.8.9.231:443 |
| Referrer Policy | no-referrer |

▼ Response Headers

| | |
|---|---|
| Access-Control-Allow-Credentials | true |
| Access-Control-Allow-Origin | https://findcare.humana.com |
| Alt-Svc | h3=":443"; ma=2592000,h3-29=":443"; ma=2592000 |
| Content-Length | 0 |
| Content-Type | application/json |
| Date | Thu, 16 Oct 2025 19:44:40 GMT |
| Strict-Transport-Security | max-age=31536000; includeSubDomains |
| Via | 1.1 google |

▼ Request Headers

| | |
|---|---|
| :authority | ingest.quantummetric.com |

*Figure 22* [115]

262. As shown in Figure 22, the browser issues a network traffic request to https://ingest.quantummetric.com, a custom domain designed to import data to Quantum Metric servers for analytics processing.

115 *Emphasis added* (this screenshot was taken from the Main Portal).

263. Once loaded, the Quantum Metric script executes in the insured's browser, enabling real-time monitoring of their interactions, capturing and transmitting the insured's activity as they search for a healthcare provider to Quantum Metric's servers.

264. By recording and reproducing the entirety of insureds' interactions (including searches, form entries, and navigation), Quantum Metric captures PHI along with other sensitive health-related data and information.

## VI. Plaintiffs Did Not Consent to Defendant's Interception, Harvesting, and Collection of Their Personal Heath Data

### A. Defendant Does Not Obtain Consent Prior to Surreptitiously Harvesting the Private Heath Data of Insureds as They Navigate Through the Website and Wellness Portal

#### 1. Defendant's Failure to Obtain Consent Concerning Plaintiffs' Website Communications

265. Defendant buries its privacy practices and policy in the footer of its Website, requiring a user to scroll to the very bottom of the page before being presented with various links titled things like, "Privacy Practices," "Privacy Policy," and "Your Privacy Choices."

266. There is nothing on Defendant's Website directing users to scroll to the bottom of the page to find Defendant's policies. Indeed, Defendant's Website appears designed to direct users *away* from Defendant's privacy policies. Before a user even reaches Defendant's privacy policies, Defendant's Website displays a bright green banner reading "Back to top," that, when clicked, returns the user to the top of the webpage.




267. There is no language indicating that there are any policies below the "Back to top" banner that will bind the user.

268. Even if a user managed to locate Defendant's privacy policy, the language within represents that Defendant's Website offers a secure and confidential digital experience for accessing health insurance services and health information:[116]

> We are committed to maintaining the highest level of confidentiality with all of the information we receive from you. For purposes of this Privacy Policy, Humana is a controller (i.e., responsible party) of your Personal Information including when we, or service providers acting on our behalf, administer the Services. In certain situations, we also administer the Services on behalf of our clients. In those instances, Humana may act as a processor or service provider to such clients, in which case the client's privacy policy, if any, will apply. We are not responsible for the privacy or data security practices of our business client or other third parties, which may differ from those set forth in this Privacy Policy.

*Figure 23* [117]

> Please read this Privacy Policy carefully. We want you to understand what information we collect from you when you use our Services, how we use such information, and whether and with whom we disclose such information. Using our Services is voluntary, and by accessing or using the Services, you (i) acknowledge that you have read and understand this Privacy Policy; and (ii) agree that your access to and use of the Services are subject to this Privacy Policy and related Terms of Use. We reserve the right to change the Privacy Policy at any time. Please review the Privacy Policy periodically to be aware of any modifications.

*Figure 24* [118]

269. This messaging strongly conveys to insureds that Defendant does not exploit their personal heath data – including data collected via the Website

---

[116] *Privacy Policy*, HUMANA INC., https://www.humana.com/legal/privacy-policy [https://perma.cc/RJ6W-GSAN].
[117] *Id. Emphasis added.*
[118] *Id. Emphasis added.*

for marketing purposes or to transmit data to third parties without clear consent.

270. In the same section of the Website labeled "Humana Privacy Policy," Defendant further states that: "we only use your sensitive Personal Information to provide you with the requested products or services and to administer your account. We do not disclose Sensitive Personal Information for purposes other than those which cannot be limited under California law":[119]

## Use of Your Sensitive Personal Information

With regard to sensitive Personal Information, we only use your sensitive Personal Information to provide you with the requested products or services and to administer your account. We do not disclose Sensitive Personal Information for purposes other than those which cannot be limited under California law.

*Figure 25* [120]

271. Defendant maintains a separate webpage, titled "Privacy Practices," which details Defendant's duties as a HIPAA covered entity. After detailing the purposes for which Defendant may disclose insureds' HIPPA-protected data, such as to process healthcare enrollment and in the case of an emergency, the Notice of Privacy Practices (the "Notice")[121] states:

**Our Responsibilities**

- We are required by law to maintain the privacy and security of your protected health information.
- We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.
- We must follow the duties and privacy practices

*Figure 26* [122]

---

[119] *Id.*
[120] *Id.*
[121] *Notice of Privacy Practices*, HUMANA INC., https://assets.humana.com/is/content/humana/GN14474HHpdf [https://perma.cc/RBZ3-JYQY].
[122] *Id.*

272. Another section of the Notice identifies the ways in which Defendant claims to fulfill its responsibilities: “We have administrative, technical, and physical safeguards in place to protect your information in various ways[.]”[123]

> information. We have administrative, technical, and physical safeguards in place to protect your information in various ways including:
> - Limiting who may see your information
> - Limiting how we use or disclose your information
> - Informing you of our legal duties about your information
> - Training our employees about our privacy program and procedures

*Figure 27* [124]

273. This language conveys a commitment to the protection of insureds’ data, particularly information like PHI that is expressly subject to HIPAA and other privacy laws and regulations.

274. On the same page, Defendant even states that it will expressly not disclose any information to third parties except with the insureds’ written authorization:[125]

---

123 *Id.*
124 *Id.*
125 *Id.*

**Will we use your information for purposes not describe[d] in this notice?**

We will not use or disclose your information for any reason that is not described in this notice, without your written permission. You may cancel your permission at any time by notifying us in writing.

The following uses and disclosures will require your written permission:

- Most uses and disclosures of psychotherapy notes
- Marketing purposes
- Sale of personal and health information

*Figure 28* [126]

275. These representations led insureds to reasonably believe that Defendant does not share or disclose sensitive health-related information or Website usage to third parties without *express* authorization.

276. The relevant HIPAA regulations demonstrate the reasonable expectations of Plaintiffs who engaged with the Website under the belief that their health-related data would remain confidential and protected.

2. <u>Defendant's Failure to Obtain Consent in the Wellness Portal</u>

277. Insureds are redirected to the Wellness Portal from the Main Portal as they explore educational resources tailored to specific health issues and ailments.

278. For example, the Wellness Portal offers a series of "courses" with embedded videos and articles published by medical experts pertaining to a variety of sensitive medical and behavioral topics such as hypertension and diabetes management.

[126] *Id. Emphasis added.*

279. The Wellness Portal does not provide insureds the capability to opt out of tracking. Instead, the Wellness Portal's privacy policy directs insureds to their web browser to manage their privacy preferences:

> address, postal address or telephone number. We participate in advertising networks that we may change from time to time. Your web browser may permit you to turn off or reject cookies, although doing so may impact your experience using this Website.

*Figure 29* [127]

280. The most common method by which Internet users opt out of tracking via their web browsers is by enabling a Do Not Track beacon ("DNT") within their browser settings. DNT is a browser feature that, when enabled, sends a "do not track" signal requesting that websites refrain from tracking their online activity.[128]

281. Despite the fact that insureds are directed to their browser settings to alter their privacy preferences, the privacy policy states in no uncertain terms that the Wellness Portal does not allow for a DNT beacon to be enabled:

[127] Privacy Policy, Go365 Medicare, https://go365medicare.mpulse.com/home/privacy. This link is only accessible when a user logs in to the website. *Emphasis added*.

[128] Glossary: *Do Not Track*, Wingify, https://vwo.com/glossary/do-not-track/, [https://perma.cc/6JNJ-9QMT].

## Do Not Track Disclosure

This Website does not monitor for or behave differently if your computer transmits a "do not track" or similar beacon or message.

*Figure 30* [129]

282. These conflicting representations leave insureds without a meaningful mechanism by which to prevent data associated with their participation in sensitive health and wellness education from being transmitted to Third-Party Vendors for the purpose of targeted advertising.

283. Despite the fact that insureds are unable to adjust their privacy preferences within the Wellness Portal, representations within the privacy policy confer upon insureds the reasonable expectation that their sensitive personal information will be protected from sale to third parties absent consent:

[129] Privacy Policy, GO365 MEDICARE, https://go365medicare.mpulse.com/home/privacy. This link is only accessible when a user logs in to the website.

> **How We Collect Information.**
>
> You may view this Website without sharing any personally identifiable information about yourself, such as your name, email, address, or similar
>
> https://go365medicare.mpulse.com/home/privacy 1/7
>
> 12/3/25, 12:03 PM Privacy Policy | Go365 Medicare
>
> information. However, if you want to enroll in a course or participate in certain sections of the Website, or if you wish to create an account, we will invite you to fill out a web-form and provide information about yourself. Your participation remains voluntary, and you do not need to provide requested information, but in such cases you may not be able to create an account, participate in certain activities, track your progress, access certain portions of or features of this Website, or receive requested information from us. We may combine

*Figure 31* [130]

284. As seen in the highlighted portions of Figure 31, the privacy policy represents in plain language that insureds are free to use the Wellness Portal "without sharing any personally identifiable information," and that even upon enrollment in a course, any inessential data transmission will not be completed without express invitation.

**B. Unlawful Interception of Plaintiffs' Website Communications**

1. <u>Unlawful Interception on Defendant's Website</u>

285. In reality, Tracking Technologies on Defendant's Website, including Tracking Pixels and Session Replay Code, begin intercepting insureds' Website Communications ***immediately*** **upon the loading of Defendant's Website**.

286. Defendant's Website does not display a pop-up, banner, or consent prompt when insureds begin interacting with coverage tools, provider searches, or other health-related features.

---

130 *Id. Emphasis added.*

287. Defendant's Website does not present its privacy policy in any conspicuous or easily accessible location before the tracking and data collection begins.

288. Instead, the privacy policy is buried in the footer of the homepage.

289. Plaintiffs did not know that Tracking Technologies, including Tracking Pixels and Session Replay Code, were being used on Defendant's Website.

290. When an insured navigates to Defendant's Website, the insured is not presented with any notification or alert regarding the personal data collected by Tracking Technologies that Defendant embedded on its Website.

291. Such notifications, which may be referred to as "pop-up" or "clickwrap" agreements, require a website user to affirmatively consent to their data being collected, often by selecting an option stating "I agree" or something similar, which Defendant's Website does not have.

292. In contrast to a conspicuous pop-up or notification, the privacy policy on Defendant's Website is in the footer and entitled "Privacy Policy," a section detailing how insureds' non-HIPAA-protected data ("Personal Information") is used. Confusingly, the policy detailing how insureds' HIPAA-protected information ("Personal Health Information" or "PHI") is used is maintained within an entirely distinct webpage, titled "Privacy Practices," which can either be accessed via the footer or via a hyperlink in the Privacy Policy.

Legal Privacy Practices Privacy Policy Washington Consumer Health Privacy Policy Your Privacy Choices Site Map Disclaimers & Licensure Fraud, Waste & Abuse Accessibility
System Requirements

© Humana 2025

*Figure 32* [131]

This Privacy Policy does not apply to Protected Health Information or information subject to the California Confidentiality of Medical Information Act that may be collected by Humana in its capacity as health care provider or payor (insurance company). Notices governing Humana's processing of Protected Health Information are available in our **privacy practices** .

*Figure 33* [132]

293. Furthermore, upon accessing Defendant's Privacy Policy or Privacy Practices, the insured will discover that they cannot change their privacy preferences in the ways detailed unless they select a separate "Your Privacy Choices" link buried in the footer.

294. This link triggers a pop-up in which Defendant admits that cookies may be used in ways that may be considered a "sale" or "sharing" of personal information under the California Privacy Rights Act.

---

[131] *Humana*, HUMANA INC., https://www.humana.com/ [https://perma.cc/GVY4-HPTY].
[132] *Privacy Policy*, HUMANA INC., https://www.humana.com/legal/privacy-policy [https://perma.cc/RJ6W-GSAN].




*Figure 34* [133]

295. As shown in Figure 34, insureds' sole option regarding their policy preferences, regardless of jurisdiction of residence, is to broadly deselect "Targeting cookies," without the ability to distinguish between specific data retrieval purposes.

[133] *Humana*, HUMANA INC., https://www.humana.com/ [https://perma.cc/GVY4-HPTY]. The Privacy toggle is available as a pop-up along the bottom of the page. There is not a distinct URL for this pop-up. *Emphasis added*.

296. The section of the Privacy Policy entitled "Use of Your Personal Information"[134] contains ambiguous language that insureds "may be able to opt out" of personalized advertisements:

**Communicating With You**

- To communicate with you and to respond to your requests, questions, comments, and other inquiries.
- To understand what partner resources you use, if any, and to connect you to additional resources at your request.
- To offer you personalized advertisements, which you may be able to opt out of as explained in the "Your Choices" section.
- To send marketing and promotional materials, including information relating to our products, Services, sales, or promotions or those of a third party.

*Figure 35* [135]

297. The language contained in the above screenshot, which references language in the "Your Privacy Choices Section" highlighting California residents' right to opt out of the sale or sharing of personal information for targeted advertising (*see* Figure 35), implies that when non-California residents deselect "Targeting cookies" when managing their privacy preferences they do not opt out of the use of their Personal Information for "personalized advertisements."

298. Defendant distinguishes a third category of personal data, "Sensitive Personal Information,"[136] which includes insureds' geolocation, Social Security or Driver's License number, login, and password information. Sensitive Personal Information is subject to its own set of policies. The language contained in the

[134] *Privacy Policy*, HUMANA INC., https://www.humana.com/legal/privacy-policy [https://perma.cc/RJ6W-GSAN].
[135] *Id. Emphasis added.*
[136] *Id.*

following screenshot (Figure 36) suggests that Defendant is limited in its use of Sensitive Personal Information to actions expressly requested by the insured.

## Use of Your Sensitive Personal Information

With regard to sensitive Personal Information, we only use your sensitive Personal Information to provide you with the requested products or services and to administer your account. We do not disclose Sensitive Personal Information for purposes other than those which cannot be limited under California law.

*Figure 36* [137]

299. Considering the information contained in the Privacy Choices pop-up regarding the sale of personal information, a claim made in the "State notices" tab of the Privacy Practices subpage — "Humana also complies with all state privacy laws, rules, and regulations" — is misleading:[138]

| **HIPAA Privacy Notice** | **State notices** | **HIPAA Individual privacy rights** |
|---|---|---|

Humana has worked throughout the company to ensure compliance with privacy provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), a federal law designed to ensure the privacy of personal and health information.

Humana also complies with all state privacy laws, rules, and regulations. In addition to reviewing the Notice of Privacy Practices, residents of the following states should review the policies specific to those states.

**California: No cost language translation - English**

**New York: Confidentiality for Domestic Violence Victims & Endangered Individuals Notice - English**

*Figure 37* [139]

[137] *Id. Emphasis added.*
[138] *Privacy Practices*, HUMANA INC., https://www.humana.com/legal/privacy [https://perma.cc/62EG-FJLZ].
[139] *Id.*

300. Later in the same document, Defendant once again reiterates that it will obtain written consent to share any PHI:

**Will we use your information for purposes not described in this notice?**
We will not use or disclose your information for any reason that is not described in this notice, without your written permission. You may cancel your permission at any time by notifying us in writing.
The following uses and disclosures will require your written permission:

- Most uses and disclosures of psychotherapy notes
- Marketing purposes
- Sale of personal and health information

*Figure 38* [140]

301. Defendant's HIPAA privacy notice further purports to inform insureds about *all* of the ways in which their information, data, or searches may be disclosed:

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.**

*Figure 39* [141]

302. The use of all capitals implies that this is a critical term and the "please read carefully" strongly suggests to the insured that these are *all* of the ways in which their PHI and sensitive health information may be disclosed.

303. If insureds close this document and return to Defendant's general subpage regarding "Privacy practices," they can scroll down and find a "Consent for release of protected health information" that requires their approval for PHI disclosure:

---

[140] *Insurance ACE Notice of Privacy Practices*, HUMANA INC., https://assets.humana.com/is/content/humana/GN14474HHpdf [https://perma.cc/Q25F-EXFB].
[141] *Id.*

**I understand that this authorization will allow Humana and its affiliates to use or disclose the protected health† information (PHI) described below:** (Please check only **one** box)

❑ Full Disclosure: Any protected health information Humana and its affiliates maintains, including mental health, HIV, health status or substance use or disorder records. This also includes sharing information on mail-order pharmacy, wellness products, and health programs with the person being authorized.

❑ Limited Disclosure: You specify what PHI to share, e.g., condition or treatment information, a specific date range, or product type. Unless you limit by product type, information will apply to all products and services. ________________

*Figure 40* [142]

304. It is only when insureds finally scroll down to a portion of Defendant's "Humana Privacy Policy" that the existence of Tracking Technologies is insinuated to exist:

**Analytics and Administration of Website**

- To administer, maintain, evaluate, and improve our websites, mobile applications, and Services, and to develop new products and services.
- To conduct research and analytics related to our websites and Services, including combining any or all of the information that we collect or obtain.

**Core Business Functions**

- To manage our business operations, perform our obligations and exercise our rights under any agreement that you or your organization has with us.
- For other purposes with your consent, or as otherwise permitted or required by applicable law.

*Figure 41* [143]

305. The disclosures include vague and passive phrasing like "to administer, maintain, evaluate, and improve our websites." Additionally, it is buried in a long page with generic and boilerplate language.

---

[142] *Consent for Release of Protected Health Information*, HUMANA INC., https://assets.humana.com/is/content/humana/SCHL2TEN_TANF_PHI_Consent_Formpdf [https://perma.cc/JR8R-H27G].

[143] *Privacy Policy*, HUMANA INC., https://www.humana.com/legal/privacy-policy [https://perma.cc/RJ6W-GSAN].

306. The disclosures fail to identify any specific Third-Party Vendors but refer to "analytics" that insureds could easily mistake for being Defendant's own trackers and not those of third parties.

307. The disclosures fail to specify what types of data are collected, such as the information in the search queries referenced above, or that the Tracking Technologies may use cookies or other tools to identify, profile, or link insureds across multiple sessions or even the Internet.

308. The disclosures do not refer to the Session Replay technology embedded throughout the Website that can record insureds' entire sessions on the Website, including typed input, mouse movements, and navigations.

309. The disclosures are not presented at the point of data collection, such as when an insured begins typing a sensitive medical condition.

310. Ironically, the disclosures themselves and the above relevant subpages make heavy use of Tracking Technologies, with the Third-Party Vendors instantly tracking insureds' clicks and what they review. For instance, when insureds click on the aforementioned privacy policies, Akamai (yet another third-party tracker) and Quantum Metric instantly collect this information through requests that send click data to their servers:

▾ General

| | |
|---|---|
| Request URL | https://17de4c0f.akstat.io/ |
| Request Method | POST |
| Status Code | 204 No Content |
| Remote Address | 23.217.76.200:443 |
| Referrer Policy | strict-origin-when-cross-origin |

*Figure 42* [144]

[144] This screenshot was taken from the Website's public-facing privacy disclosures.




*Figure 43* [145]

311. Insureds are not asked to consent prior to browsing Defendant's Website, and they are wiretapped **from the moment they load the site**,[146] regardless of whether they eventually navigate to, download, read, or understand the disclosures in the privacy notice.

312. At no point does Defendant seek affirmative consent from insureds prior to the initiation of data tracking.

313. Valid consent to interception must be actual, informed, and voluntary.

314. In sum, the privacy disclosures on Defendant's Website is structured to deflect insureds' attention from the scope of Defendant's impermissible, unlawful data collection by including misleading general disclosures, which themselves must be pieced together across several pages. The privacy disclosures provide no explanation of the Tracking Technologies that Defendant employs, no complete disclosure about the sharing of queries and sensitive information with third parties

[145] This screenshot was taken from the Website's public-facing privacy disclosures.

[146] *Javier v. Assur. IQ, LLC*, No. 21–16351, 2022 U.S. App. LEXIS 14951, at *5 (9th Cir. May 31, 2022) (retroactive consent is not consent for digital wiretapping).

(including which third parties), and no way to opt out of Defendant's surreptitious collection of private health information. Insureds like Plaintiffs are left unaware that their keystrokes, searches, and clicks are being intercepted in real-time. This deception cannot constitute actual, informed, or voluntary consent.

315. In light of the above, Plaintiffs did not consent to Defendant's interception and collection of their Website Communications.

2. Unlawful Interception in the Wellness Portal

316. Although the Wellness Portal's privacy policy represents that insureds will be expressly asked for consent prior to transmitting data associated with highly sensitive medical and behavioral health interactions and that insureds are not required to provide such information, Third-Party Vendors actively intercept insureds' data as insureds navigate through the portal.

317. For example, when an insured clicks on a tile detailing a course titled "Living with Anxiety and Depression," data associated with the insured's sensitive session is transmitted to Google Analytics:




*Figure 44* [147]




*Figure 45* [148]

318. Google Analytics is a core service within Google's Broader Marketing Platform that, according to Google, allows users to "discover new and predictive insights from [their] data – such as which users are likely to purchase or churn."[149] One feature of the platform purports to enable customers to "[m]onitor activity on [their] site as it happens."[150]

---

147 *Emphasis added* (this screenshot was taken from the Wellness Portal).
148 This screenshot was taken from the Wellness Portal.
149 *Analytics: Benefits*, GOOGLE, https://marketingplatform.google.com/about/analytics/benefits/ [https://perma.cc/3SM8-7D9G].
150 *Analytics: Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ [https://perma.cc/JZD6-U5UF].

319. Similarly, when an insured clicks on a tile detailing another course offered by the Wellness Portal titled "Nutrition for Diabetes Management," Google Analytics executes another unique request:




*Figure 46* [151]




*Figure 47* [152]

320. This time, as seen in the highlighted portions of Figures 46 and 47, text associated with the title of the course is embedded directly in the Google Analytics request URL, notifying Third-Party Vendors that the insured is interested in "diabetes management cooking."

---

[151] *Emphasis added* (this screenshot was taken from the Wellness Portal).
[152] *Emphasis added* (this screenshot was taken from the Wellness Portal).

321. The above figures show how, counter to Defendant's representations within the Wellness Portal about obtaining the consent of insureds, Third-Party Vendors surreptitiously gather insureds' sensitive information as they seek health and wellness education *prior to* obtaining consent and *prior to* insureds' enrollment in a course.

**C. Defendant's Conduct Violates HIPAA's Privacy Rules**

322. Because Defendant is a health insurance provider, insureds have an elevated expectation that their Website activity will remain private and secure.

323. Relatedly, courts and regulators have recognized that health-related data warrants elevated privacy protections due to its sensitivity and the risk of its misuse.

324. HIPAA's enhanced protections for health-related data support the conclusion that Plaintiffs had a reasonable expectation of privacy in interacting with Defendant's Website.

325. HIPAA prohibits business associates of covered entities like Defendant from using or disclosing PHI for purposes such as marketing, analytics, or other transmissions to third parties, unless the individual has provided a valid, written authorization. *See* 45 C.F.R. § 164.508(a)(3).

326. A valid HIPAA authorization must be written, specific, and signed by the individual. It must identify the data to be used or disclosed, the recipient, and the purpose. *See* 45 C.F.R. § 164.508(c)(1)(i)–(vi).

327. CMS regulations also prohibit the sharing of such private health information. 42 C.F.R. § 422.118(a)–(d); 423.136(a)–(d).

328. Defendant's integration of Tracking Technologies on its pages results in the automatic and unauthorized transmission of sensitive health-related data of the insureds of Defendant to third parties that include the Third-Party Vendors.

329. At no point did Defendant obtain HIPAA-compliant written authorizations from such insureds before this transmission occurred.

330. The privacy policy on Defendant's Website does not come close to providing the specificity, clarity, or accessibility required to satisfy HIPAA's notice and its authorization requirements.

331. Defendant's failure to transparently disclose its data practices, along with how insureds engage with Defendant's Website, violates HIPAA's core principle that individuals must be given control over their health information and be empowered to authorize or reject such disclosures.

332. By covertly transmitting insureds' interactions related to health services to third parties without authorization, Defendant has failed to meet the heightened duty of care owed to entities in possession of sensitive health information, as memorialized in HIPAA's statutory and regulatory regime and by CMS regulations.

333. At bottom, Defendant failed in its core healthcare obligations as both an insurer and a government contractor and administrator of Medicare benefits by prioritizing marketing analytics and commercial gain over patient privacy.

**D. The Applicable Statutes of Limitation Are Tolled**

334. None of the Plaintiffs were aware that their private health data was being intercepted and sent to the Third-Party Vendors.

335. None of the Plaintiffs consented to Defendant and the Third-Party Vendors intercepting their private health data.

336. Plaintiffs could not have, despite full diligence, discovered the full scope of Defendant's conduct as alleged herein, as there was no indication of the scope of the above-described Tracking Technologies that Defendant employs on Defendant's Website.

337. Accordingly, the applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the full scope of its use of these Tracking Technologies.

338. Defendant was under a duty to disclose the nature and extent of its data collection practices but did not do so.

339. Defendant is therefore estopped from relying on any statute of limitations defenses.

## VII. Defendant Does Not Honor Plaintiffs' Tracking Opt-Outs Within Defendant's Purportedly "Secure" Patient Portals

### A. Defendant Deploys Tracking Technologies *Even After* Insureds Switch Off "Targeting Cookies" Within the Main Portal

340. Insureds can adjust their privacy preferences within the Main Portal.

341. When an insured scrolls to the bottom of the Main Portal landing page and selects the "Your Privacy Choices" hyperlink buried in the footer, the Website retrieves a pop-up identical to the one displayed in Figure 34.

342. When the insured toggles off "Targeting cookies" and selects "Confirm my choices," the insured conveys in no uncertain terms to Defendant that they do

not want their personal information sold or shared for "cross-context behavioral advertising."

343. Upon deselection, the Main Portal retrieves a notice stating that "[y]our opt-out preference is confirmed," thereby conferring upon the insured a reasonable expectation that Defendant's Website will adjust its deployment of Tracking Technologies according to the insured's indicated preferences.




*Figure 48* [153]

344. In fact, in addition to the above confirmation, insureds encounter the following bolded representation under the "Manage Access" tool within the Main Portal after opting out of targeting cookies:




*Figure 49* [154]

---

[153] This screenshot was taken from the privacy toggle on the Main Portal.
[154] *Emphasis added* (screenshot taken from Manage Access tool of the Main Portal).

345. The representation in Figure 49 communicates in no uncertain terms to insureds that their PHI will not be transmitted to Third-Party Vendors after opting out of targeting cookies.

346. Instead, even after insureds' cookie preferences are confirmed, various Third-Party Vendors continue to surreptitiously gather their sensitive health-related searches.

347. When an insured accesses the "Find Care" subpage of the Main Portal and selects "Mental Health Care," they are prompted to complete a quiz evaluating their mental health. When an insured selects answers such as "I'm feeling anxious, nervous, worried, or panicked," or "I'm experiencing grief or sadness due to a loss," Third-Party Vendors ForeSee and Adobe execute requests that track insureds' sensitive selections by sending them to their servers in real time as shown below:




*Figure 50* [155]

155 *Emphasis added* (screenshot taken from Main Portal).




*Figure 51* [156]




*Figure 52* [157]




*Figure 53* [158]

---

[156] This screenshot was taken from the mental health quiz on the Main Portal.
[157] *Emphasis added* (screenshot taken from quiz on the Main Portal).
[158] This screenshot was taken from the mental health quiz on the Main Portal.

348. Defendant's Website provides insureds with a privacy setting that purports to allow them to opt out of tracking and targeted advertising. As shown above, this setting represents to insureds that their personal information will no longer be collected or shared with Third-Party Vendors once the opt out is enabled.

349. If the opt out setting functions as represented, enabling it should prevent the Website from sending the insureds' browsing activity and content to the Third-Party Vendors.

350. However, the opt out is not effective.

351. As seen in Figures 50 through 53 above, Defendant's embedded Tracking Technologies remain active *even after* the insured opts out of targeted advertising; the Website transmitted data to Adobe's servers after the opt out setting was enabled, demonstrating that the privacy control did not stop collecting or disclosing the insured's information.

352. In fact, Adobe continues to capture the insureds' quiz answers, transmitting highly sensitive mental health information directly to Adobe's analytics platform:




*Figure 54* [159]

[159] *Emphasis added* (screenshot taken from mental health quiz on Main Portal).



2.renewal.a|pcp_change_eligible|col_compliant|bcs_compliant|awv_pcp_variation|my2.004.25.b","eVar71":"2025-12-03t11:48:22","eVar73":"/get-care/mental-health/questions","eVar74":"https://my2.humana.com/get-care/mental-health/questions","eVar5":"1108326638","eVar14":"false","eVar15":"false","eVar26":"false","eVar47":"true"},"props":{"prop75":"14453029675679453694183951844116948367","prop1":"member portal: get care - mental-health | questions","prop35":"im experiencing grief or sadness due to a loss","prop16":"0805010015","prop17":"english","prop18":"n","prop19":"member portal: get care | mental-health","prop20":"members","prop44":"1343_link137","prop60":"my2.humana.com/get-care/mental-health/questions","prop61":"my2.navlink.new|my2.renewal.a|pcp_change_eligible|col_compliant|bcs_compliant|awv_pcp_variation|my2.004.25.b","prop71":"2025-12-03t11:48:22","prop73":"/get-care/mental-health/questions","prop74":"https://my2.humana.com/get-care/mental-health/questions","prop2":"11","prop3":"3","prop4":"48","prop5":"12","prop6":"2025","prop7":"03","prop8":"questions","prop10":"what is your main concern today?","prop12":"member_portal:_get_care_-_mental-health_|_questions","prop13":"12_03_2025","prop14":"11:48:22","prop27":"member_portal:_get_care_-_mental-health_|_questions","prop34":"body","prop36":"secondary cta","prop38":"button","prop21":"267","prop22":"3375"}}}}},"data":{"targetMigrationEnabled":true}}],"query":{"identity":{"fetch":["ECID","CORE"]}},"meta":{"state":{"domain":"humana.com","cookiesEnabled":true}}}

*Figure 55* [160]

353. The highlighted portion of the above payload (i.e., the content or data being transmitted) associated with an smetrics.humana.com request is nearly identical to the insured's selected answer. That means Defendant's portal is sending Adobe information revealing that the insured is "experiencing grief or sadness due to a loss."

354. Third-Party Vendor Tealium's Tracking Technologies also remain active *after* an insured opts out of targeting cookies in the Main Portal. For instance, when an insured accesses the "Find Care" tool and selects "Adolescent Back Pain and Spondylosis" from a search field dropdown menu, Tealium makes the following request:

---

[160] *Emphasis added* (screenshot taken from mental health quiz on Main Portal).




*Figure 56* [161]




*Figure 57* [162]

355. Figures 56 and 57 demonstrate how Tealium tracks an insured's selection of a specific medical condition via a series of embedded cookies (see "Cookies" heading in the above request) as they seek tailored medical care.

356. The payload associated with this request demonstrates how Tealium collects data, enables the assignment of a series of unique identifiers to the insured, and transmits these data to a network of additional third parties:

---

161 *Emphasis added* (screenshot was taken from Find Care subpage on Main Portal).
162 This screenshot was taken from Find Care subpage on Main Portal.




*Figure 58* [163]

357. The highlighted segments of Figure 58 show how Tealium surreptitiously gathers information such as the date and time of the insured's back pain search, permits Adobe to assign the insured a unique identifier beginning with "14453," and transmits this information to "aa_trackingserver," which is associated with Amazon Ad Server.[164]

358. Amazon Ad Server, which "offers brands and agencies the tools for creating engaging ads and centralizing applicable insights,"[165] is one of the many integrations Tealium offers its customers. As shown in Figures 56 and 57, Tealium transmits session replay information associated with an insured's search of a sensitive medical condition to additional third-party vendors for the purpose of

---

[163] *Emphasis added* (screenshot taken from mental health quiz on Main Portal).
[164] *Amazon Ad Server*, TEALIUM, https://tealium.com/integrations/amazon-ad-server/ [https://perma.cc/2P27-R3XV].
[165] *Id.*

providing targeted ads to the insured, despite the fact that "Targeting cookies" are toggled off.

### B. Defendant Deploys Tracking Technologies *Even After* Insureds Switch Off "Targeting Cookies" Within the Prescription Portal

359. Insureds are redirected to the Prescription Portal via the "Prescriptions" subpage of the Main Portal when they check their order history or make changes to their prescriptions.

360. Insureds are not provided notice that they are leaving the Main Portal, despite the fact that the Prescription Portal is hosted on a unique domain: centerwellpharmacy.com. Insureds therefore reasonably expect the Prescription Portal to adhere to the same Privacy Policy and Terms of Use as both the main Website and Main Portal.

361. Furthermore, language contained within the Prescription Portal's privacy policy[166] gives insureds the reasonable expectation that the portal will obtain consent prior to disclosing any of their personal information to unaffiliated third parties:

[166] *CenterWell Privacy Policy*, CENTERWELL PHARMACY, https://www.centerwell.com/centerwell-humana-privacy-policy [https://perma.cc/28WR-EDQW].

- **Other Disclosures With Your Consent**. We may disclose your Personal Information with your consent to other unaffiliated third parties who are not described elsewhere in this Privacy Policy. For example, we may provide your Personal Information to healthcare providers and healthcare clearinghouse.

*Figure 59* [167]

362. "Personal Information" as it is used in Figure 59 includes direct and personal identifiers such as the insured's name and address, demographic information, weblogs concerning insureds' activities on the Website, operating system, and geolocation information, among other categories of data.

363. Insureds were not asked for and did not provide Defendant consent to disclose their personal information to unaffiliated third parties.

364. In the absence of consent, the privacy policy contains the following language regarding insureds' ability to opt out of the sale or sharing of their personal information:

- **Opt Out of the "Sale" or "Sharing" of Personal Information:** In certain circumstances, our use of cookies or other tracking technologies may be subject to an opt-out under applicable law. As such, you can opt out of our use of tracking technologies and cookies by contacting us below.

*Figure 60* [168]

365. The vague language used in the above figure fails to direct insureds to a tangible opt out mechanism, and does not specify the circumstances under which

---

[167] *Id. Emphasis added.*
[168] *Id.*

insureds are entitled to opt out. Instead, it is incumbent upon insureds to determine their data privacy rights and adjust their use of the Prescription Portal accordingly.

366. Although the privacy policy makes no mention of opt out toggles, insureds adjust their privacy preferences within the Prescription Portal the same way they adjust their privacy preferences on Defendant's Website prior to entering their patient portal credentials:




*Figure 61* [169]

367. As with the Main Portal, insureds receive confirmation of their updated privacy preferences after deselecting "Targeting cookies" and clicking "Confirm my choices," thereby conferring upon insureds a reasonable expectation that Defendant's Website will adjust the deployment of its Tracking Technologies accordingly.

[169] This screenshot was taken from the privacy toggle on the Prescription Portal.




*Figure 62* [170]

368. Instead, when an insured accesses the "My Orders" subpage of the Prescription Portal, ForeSee makes a background request that causes the insured's browser to send detailed information (including page content) directly to ForeSee's servers:

[170] This screenshot was taken from the Prescription Portal.




*Figure 63* [171]




*Figure 64* [172]

369. As seen in Figures 63 and 64, ForeSee surreptitiously gathers information associated with an insured's prescriptions and transmits this information to its analytics platform, despite the fact that the insured has opted out of cookies used for analytics and advertising.

370. Invoca also executes a request on the "My Orders" page via the URL https://pnapi.invoca.net, causing the insured's browser to transmit data to Invoca's servers:

---

[171] *Emphasis added* (screenshot was taken from the Prescription Portal).
[172] This screenshot was taken from the Prescription Portal




*Figure 65* [173]




*Figure 66* [174]

371. Invoca offers its services via a series of internal platforms[175] such as Call Tracking, Interaction Management, and Invoca Exchange, which, much like Tealium, allow Invoca customers to integrate their services with other third-party analytics and advertising platforms such as Google Ads and Adobe Experience Platform.[176]

372. As seen in Figure 66, Invoca continues to deploy its Tracking Technologies after insureds have opted out of targeting cookies to gather information associated with their prescription management and routes such

---

[173] *Emphasis added* (screenshot was taken from the Prescription Portal).
[174] This screenshot was taken from the Prescription Portal.
[175] *Products*, INVOCA INC., https://www.invoca.com/, [https://perma.cc/7CW8-Y9DT].
[176] *The Invoca Exchange*, INVOCA INC., https://www.invoca.com/integrations [https://perma.cc/H2EZ-XPZR].

information to its analytics platform, which could be integrated with numerous third-party advertisers.

373. In fact, the data associated with Invoca's request suggests that the insured's prescription information is attached to a user profile built by Tealium, and that their actions on the My Orders page may be transmitted to an entire network of advertisers:




*Figure 67* [177]

---

[177] *Emphasis added* (screenshot was taken from the Prescription Portal).




*Figure 68* [178]

374. As seen in the highlighted segments of Figures 67 and 68, the insured is assigned a Tealium identifier beginning with "17647" under which the insured's site interactions are stored. Furthermore, Invoca associates its request with an advertising campaign (*see* "advertising_campagin_id_from_network").

## CLASS ACTION ALLEGATIONS

375. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of a putative class of the following similarly situated individuals (collectively, the "Class"):

> Every current and former insured of Humana whose Website Communications were captured from January 23, 2023, through the date of the judgment, through the use of Tracking Technologies

---

[178] *Emphasis added* (screenshot was taken from the Prescription Portal).

embedded in Defendant's Website, www.humana.com, subpages, and patient portals to the date of judgment herein.

376. **Numerosity:** The Class includes thousands of people, such that it is not practicable to join all class members into one lawsuit.

377. **Commonality:** This case presents questions of law and fact that are common to the Class, including:

- Whether Defendant enables Third-Party Vendors to intercept the Website Communications of insureds to Defendant's Website, www.humana.com, subpages, and insureds' portals;
- Whether Defendant intentionally disclosed the intercepted Website Communications of its insureds;
- Whether Defendant acquired the contents of insureds' Website Communications without their consent;
- Whether Defendant's conduct violates the FWA and Kentucky common law;
- Whether Defendant's conduct violates CMS rules or regulations or any contracts with the same;
- Whether Defendant's conduct violates any state-specific Medicaid regulations or contracts with state entities;
- Whether Plaintiffs and Class members are entitled to equitable relief; and

- Whether Plaintiffs and Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

378. **Typicality:** Plaintiffs, Class members, and Defendant have a commonality of interest in the subject matter of the lawsuit and the remedy sought.

379. **Predominance:** The common questions of law and fact predominate over any individual issue that may arise on behalf of an individual Class member.

380. **Superiority:** A class action is the appropriate vehicle for fair and efficient adjudication of the claims of Plaintiffs and Class members because if individual actions were required to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardship to the Class, to the Court, and to Defendant.

381. **Adequacy of representation:** Plaintiffs and counsel will fairly and adequately protect the interests of Class members. Plaintiffs' counsel, Schlichter Bogard, will fairly and adequately represent the interests of the Class. Schlichter Bogard has a well-documented track record of successfully serving as class counsel in this Circuit and elsewhere. Schlichter Bogard's pioneering work in class actions has been covered by numerous national publications, including the New York Times and Wall Street Journal, among other media outlets.

382. Schlichter Bogard has also been widely recognized by federal judges across the United States as pioneers in fiduciary breach class action litigation.

Schlichter Bogard's vast experience in this area is reflected by the firm's appointment as class counsel in over 30 fiduciary breach class actions.

383. Federal judges have repeatedly recognized that Schlichter Bogard's efforts and successful outcomes have led to "enormous" savings for class members. *E.g.*, *Cates v. Trs. of Columbia Univ.*, No. 1:16-cv-06524-GBD, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021).

384. Schlichter Bogard has additionally handled, and repeatedly prevailed in, fiduciary breach class action litigation in the U.S. Supreme Court. For example, in *Tibble v. Edison International*, a landmark fiduciary breach class action handled by Schlichter Bogard, after a partial loss in the U.S. District Court for the Central District of California, which was upheld by the U.S. Court of Appeals for the Ninth Circuit, Schlichter Bogard achieved a reversal before the Supreme Court of the United States. The Supreme Court's vacatur in favor of the plaintiffs was unanimous. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015).

385. Schlichter Bogard secured a reversal of a dismissal before the U.S. Supreme Court, again in a unanimous decision, in *Hughes v. Northwestern University* – another fiduciary breach class action. *See Hughes v. Nw. Univ.*, 595 U.S. 170 (2022).

386. In *Cunningham v. Cornell University*, yet another fiduciary breach class action, which was decided by the U.S. Supreme Court in 2025, Schlichter Bogard again achieved a unanimous victory. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 695, 145 S. Ct. 1020, 1024 (2025).

387. Other courts have repeatedly heralded Schlichter Bogard's work in class action litigation. By way of limited example:

388. "This Court is unaware of any comparable achievement of public good by a private lawyer in the face of such obstacles and enormous demand of resources and finance." Order on Attorney's Fees, *Mister v. Illinois Central Gulf R.R.*, No. 81-3006 (S.D. Ill. 1993).

389. Another U.S. district judge found as follows: "Class Counsel performed substantial work . . . investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the [class]." *Will v. General Dynamics*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *8–9 (S.D. Ill. Nov. 22, 2010).

390. Other findings by U.S. district judges in relation to Schlichter Bogard's work include the following: "Schlichter, Bogard [] has achieved unparalleled results on behalf of its clients, . . . has invested . . . massive resources and persevered in the face of . . . enormous risks[.]" *Nolte v. Cigna*, No. 07-2046, 2013 U.S. Dist. LEXIS 184622, at *8 (C.D. Ill. Oct. 15, 2013).

391. "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S. Dist. LEXIS 12037, at *8 (S.D. Ill. Jan. 31, 2014).

392. "Schlichter, Bogard [] demonstrated extraordinary skill and determination in obtaining this result for the Class." *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *9 (S.D. Ill. July 17, 2015).

**CAUSES OF ACTION**

**COUNT I – VIOLATION OF FEDERAL WIRETAP ACT (ON BEHALF OF PLAINTIFFS AND THE CLASS)**

393. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

394. The FWA gives a private right of action to anyone whose communications are intercepted, disclosed, or used in violation of the statute. 18 U.S.C. § 2520(a).

395. The FWA, as amended by the ECPA, prohibits any person from intentionally intercepting, disclosing, or using the contents of any wire, oral, or electronic communication without consent or as otherwise permitted by law.

396. The FWA, as amended by the ECPA, extended wiretap protections to digital transmissions like those alleged herein.

397. Plaintiffs' interactions and Website Communications with Defendant's Website are "electronic communications" under 18 U.S.C. § 2510(12), and the information they contain constitutes "contents" under 18 U.S.C. § 2510(8).

398. Defendant, through tracking code embedded on its Website, intentionally intercepted these Website Communications and they were disclosed to the Third-Party Vendors without Plaintiffs' knowledge or valid consent.

399. Any alleged one-party consent by Defendant is invalid because Defendant committed a federal crime of "knowingly" disclosing "individually identifiable health information" to third parties. 42 U.S.C. § 1320d–6(a),

400. Any alleged one-party consent by Defendant is invalid because Defendant committed torts as outlined herein, like intrusion upon seclusion.

401. As a result, the consent exception is void under the FWA and Defendant is liable for damages. 18 U.S.C. § 2511(2)(d).

402. Plaintiffs request the relief set forth in the Request for Relief below.

**COUNT II – BREACH OF FIDUCIARY DUTY**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

403. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

404. As a covered entity under HIPAA, Defendant had a fiduciary duty to maintain the confidentiality and privacy of Plaintiffs' PHI, including the Website Communications made on Defendant's Website.[179]

405. Defendant likewise had a fiduciary duty, under Kentucky law, to ensure the confidentiality of patient data, including KRS § 210.235, KRS § 216.515(7), and KRS § 422.315, which mandate that medical records and patient data be treated as confidential and even subject disclosing persons to criminal penalties.

[179] 145 C.F.R. § 164.502 (uses and disclosures of protected health information).

406. Defendant's fiduciary duty extended to ensuring that any collection, use, or sharing of PHI was done only with the specific informed consent of the individual from whom the information was collected.[180]

407. At all relevant times, a relationship existed between Plaintiffs and Defendant, in which Plaintiffs entrusted Defendant to protect the private health-related information of Plaintiffs and members of the putative class, and Defendant accepted that trust.[181]

408. Defendant breached the fiduciary duty that it owed to Plaintiffs and the putative class by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, or intentionally disclosing, this private health-related information, while deliberately concealing its breaches from Plaintiffs.[182]

409. Defendant's actions in enabling the interception and transmission of Plaintiffs' sensitive health information without informed consent constitute a breach of the fiduciary duty that Defendant owes Plaintiffs under Kentucky law.

410. As a direct result of Defendant's actions, Plaintiffs have suffered harm, including but not limited to the unauthorized disclosure of their highly sensitive health information, the risk of identity theft, and other potential damages arising from the unauthorized collection and sharing of personal health data.

411. Plaintiffs request the relief set forth in the Request for Relief below.

---

[180] *Id.*
[181] *Abney v. Amgen, Inc.*, 443 F.3d 540 (6th Cir. 2007).
[182] *In re Sallee*, 286 F.3d 878, 892 (6th Cir. 2002).

**<u>COUNT III – INTRUSION UPON SECLUSION</u>**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

412. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

413. Under Kentucky law, the tort of intrusion upon seclusion occurs when a party intentionally intrudes, physically or otherwise, into a matter that the plaintiff has a right to keep private, and the intrusion would be highly offensive to a reasonable person.[183]

414. Given Defendant's failure to disclose their surreptitious use of third-party Tracking Technologies, Plaintiffs had a reasonable expectation of privacy in their interactions with Defendant's Website, including in their search queries and page visits relating to their personal conditions and potential treatments.[184]

415. Because Defendant's portal required users to login with usernames and passwords, and because Defendant represented that its portal was a secure healthcare tool, Plaintiffs' expectation of privacy was strong.

416. Defendant's Website purports to offer security for accessing such health information.

417. However, without Plaintiffs' knowledge or consent, Defendant embedded Tracking Technologies (including those from the Third-Party Vendors) on

[183] *Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp. 2d 808, 822 (W.D. Ky. 2003) (quoting Restatement (Second) of Torts § 652B).
[184] *Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695, 703 (6th Cir. 2011) (confirming that Kentucky law recognizes intrusion upon seclusion).

the Website, including the patient portal, to record and transmit Website Communications in real-time.

418. Defendant deliberately intruded into Plaintiffs' private affairs, in a way that a reasonable person would find highly offensive, especially given that Defendant failed to disclose the extent of the Tracking Technologies and even made representations that insureds' information would remain confidential.

419. The conduct of Defendant involved the most private domain of all: Plaintiffs' health-related decisions and conditions inside a purportedly secure portal.

420. In so doing, Defendant egregiously violated Kentucky's privacy norms and legal protections.

421. As a direct and proximate result of Defendant's actions, Plaintiffs suffered and continue to suffer injuries, including loss of privacy, exposure to increased risk of identity theft, and loss of control over their private data.

422. Plaintiffs request the relief set forth in the Request for Relief below.

**COUNT IV – UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

423. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

424. Under Kentucky law, unjust enrichment occurs when a benefit was conferred upon a defendant, plaintiffs conferred that benefit without compensation,

and it would be inequitable for a defendant to retain that benefit without paying for its value.[185]

425. Plaintiffs conferred a monetary benefit on Defendants in the form of valuable personal health-related information, and in the form of insurance premiums paid to Defendants.

426. Defendant obtained a significant financial benefit by covertly collecting, using, and sharing the personal health-related data of Plaintiffs with third parties, including the Third-Party Vendors, without consent.

427. Defendant has been unjustly enriched by using this sensitive health information, which has enormous value, to generate profits through targeted advertising and the sale or use of the data by third parties, including the Third-Party Vendors.

428. By collecting and transmitting these data without providing adequate notice or obtaining informed consent, Defendant has exploited the private health information of Plaintiffs for illicit financial gain, in violation of principles of fairness and equity.

429. In contrast, Plaintiffs have suffered harm, including the loss of privacy and the potential for identity theft.

---

[185] *Guarantee Electric Co. v. Big Rivers Electric Corp.*, 669 F. Supp. 1371, 1380–81 (W.D. Ky. 1987).

430. Plaintiffs would not have purchased Defendant's insurance, or would have paid less for Defendant's insurance had they known Defendant would surreptitiously track and sell their private data.

431. The benefits that Defendant derived from Plaintiffs rightly belong to Plaintiffs as it is their private health information.

432. It would be inequitable under unjust enrichment principles for Defendant to retain any of the profits or other benefits derived from the practices alleged in this Complaint.

433. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs all unlawful or inequitable proceeds received as a result of the conduct alleged in this Complaint.

## REQUEST FOR RELIEF

Plaintiffs, on behalf of themselves and the Class, request judgment against Defendant as follows:

A. Certifying this case as a class action, appointing Plaintiffs as Class representatives, and appointing Plaintiffs' counsel as Class counsel for the Class and Subclass;

B. Finding that Defendant's conduct violates the FWA and Kentucky common law;

C. Awarding actual damages caused by Defendant's violations of the FWA and Kentucky common law;

D. Awarding statutory damages as provided under 18 U.S.C. § 2520, including the greater of $10,000 or $100 per day for each violation of the FWA;

E. Awarding compensatory damages, restitution, disgorgement, attorneys' fees and costs, and/or punitive damages as permitted by law and as the Court deems just and proper;

F. Entering equitable relief enjoining Defendant from engaging in the misuse and/or disclosure of Plaintiffs' and Class members' data, and the issuance of prompt, complete and accurate disclosures to Plaintiffs, Class members, and all current and future users of the Website;

G. Entering equitable relief requiring restitution and disgorgement of any profits wrongfully obtained as a result of Defendant's wrongful conduct;

H. Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

I. Awarding such other and further relief as this Court deems appropriate and as equity and justice may require.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class, request trial by jury of all claims asserted herein.

April 13, 2026

Respectfully submitted,

/s/ Andrew D. Schlichter
Andrew D. Schlichter (admitted *pro hac vice*)
Alexander L. Braitberg (admitted *pro hac vice*)
Chen Kasher (admitted *pro hac vice*)
Cort VanOstran (admitted *pro hac vice*)
SCHLICHTER BOGARD LLC
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
(314) 621-6115
(314) 621-5934 (fax)
aschlichter@uselaws.com
abraitberg@uselaws.com
ckasher@uselaws.com
cvanostran@uselaws.com
*Lead Counsel for Plaintiffs*

Jerome Prather
GARMER & PRATHER, PLLC
Jerome Prather
141 North Broadway
Lexington, KY 40507
(859) 254-9351
jprather@garmerprather.com
*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13rd day of April 2026, a true and correct copy of the foregoing document was filed via the Court's CM/ECF filing system and will be available to all counsel of record.

/s/ Andrew D. Schlichter
Andrew D. Schlichter